## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WESTERN PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. MICHAEL LAUKAITIS; GREGORY CARTER; OKSANA HISER; GARLAND RICHIE, SEAN A. LARDO, JACK BORING, and; CHANEL DENNIS, | ) ) ) ) ) ) | CIVIL ACTION NO. 11-601 |
| Plaintiffs, | ) ) ) | *(FILED IN CAMERA AND UNDER SEAL PURSUANT TO THE FALSE* |
| v. | ) ) | *CLAIMS ACT, 31 U.C.S. §§ 3729, et seq.)* |
| EDUCATION MANAGEMENT CORPORATION; EDUCATION MANAGEMENT, LLC; EDMC ONLINE HIGHER EDUCATION; THE ART INSTITUTE ONLINE, INC. a/k/a THE ART INSTITUTE OF PITTSBURGH ONLINE DIVISION a/k/a THE ART INSTITUTES ONLINE; SOUTH UNIVERSITY, LLC d/b/a SOUTH UNIVERSITY ONLINE; and ARGOSY EDUCATION GROUP, INC. d/b/a ARGOSY UNIVERSITY ONLINE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | FILED<br><br>OCT 2 2 2013<br><br>CLERK U.S. DISTRICT COURT<br>WEST. DIST. OF PENNSYLVANIA |
| Defendants. | ) | |

## THIRD AMENDED COMPLAINT

Plaintiffs/Relators Michael Laukaitis, Gregory Carter, Oksana Hiser, Garland Richie, Sean A. Lardo, Jack Boring, and Chanel Dennis acting for themselves and on behalf of the United States of America, by and through their attorneys, Alan H. Perer, Esquire and Swensen, Perer & Kontos, and James B. Lieber, Esquire and Lieber Hammer Huber & Bennington, P.C. allege as follows:

### I. Introduction

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising out of false claims approved and presented by Defendants in violation

of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA" or "Act").  At issue are false claims and statements submitted to the United States Department of Education ("DOE") in order to participate in the federal financial aid program and obtain funds from the federal government.

2.      The FCA prohibits the submission of false or fraudulent claims for payment to the United States or the making of false statements for the purpose of causing a false claim to be paid.  The FCA provides that any person who knowingly submits, or causes to be submitted, false or fraudulent claims to the government for payment or approval is liable for a civil penalty of up to $11,000 for each claim, plus three times the amount of damages sustained by the government.  The Act empowers persons with information regarding false or fraudulent claims made to the government, "relators," to bring an action on behalf of the United States and to share in the recovery.

3.      Pursuant to the Act Plaintiffs/Relators, Michael Laukaitis, Gregory Carter, Oksana Hiser, Garland Richie, Sean A. Lardo, Jack Boring, and Chanel Dennis, seek to recover on behalf of the United States, damages and civil penalties arising from false and improper claims for payment that Defendants submitted, or caused to be submitted, to the government and in connection with student loan and grant applications under the Higher Education Act, Title IV ("HEA"), and educational assistance provided by the Department of Veterans Affairs ("VA"), from at least December 1, 2008 continually through the present.

4.      Defendants obtained and continue to obtain millions of dollars annually in the form of federal student financial aid funds from the DOE and military funds from the VA.  In obtaining these funds, Defendants falsely represented, and continue to represent each year, that they are in compliance with HEA regulations governing recruiter compensation, information provided to prospective students, and the amount of revenue that may be received from federal

financial aid sources. Defendants also falsely represent that they comply with VA regulations governing the information that must be provided to prospective military students. Defendants had, and continue to have, actual knowledge that they are not adhering to the HEA and VA requirements, that their representations of adherence were and are false, and they therefore were and are submitting false or fraudulent representations of compliance. Alternatively, Defendants act and acted with deliberate indifference and/or reckless disregard as to the truth or falsity of their claims of compliance.

5.      In addition to falsely certifying their compliance with these HEA and VA regulations, Defendants directly defraud the federal government through the filing of false federal financial aid applications and the misuse of federal monies. Defendants had, and continue to have, actual knowledge that they were and are submitting false or fraudulent claims for federal student aid funds to the federal government. Alternatively, Defendants act and acted with deliberate indifference and/or reckless disregard as to the truth or falsity of these claims for federal monies.

6.      Relators assert causes of action under the False Claims Act for the submission of knowingly false or fraudulent claims for payment or approval, and knowingly false records or statements used in the payment or approval of false or fraudulent claims, in violation of 31 U.S.C. §§ 3729(a)(1)(A) and (B). Furthermore, Relators assert that Defendants conspired to commit violations of the False Claims Act, in violation of 31 U.S.C. §§ 3729(a)(1)(C).

## II. **JURISDICTION AND VENUE**

7.      This action is brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and subject matter jurisdiction is invoked pursuant to 29 U.S.C. § 1331. This case arises from the wrongful conduct of Defendants in obtaining funds from the DOE, pursuant to the HEA.

8.      This Court has *in personam* jurisdiction over the Defendants under 31 U.S.C. § 3732(a), which authorizes nationwide service of process.

9.      As required under the False Claims Act, 31 U.S.C. § 3730(b)(2), Relators, simultaneously with the filing of the original Complaint, provided to the United States Attorney for the Western District of Pennsylvania a statement of all material evidence and information related to the Complaint. This disclosure statement supports the existence of violations of the False Claims Act (31 U.S.C. §§ 3729(a)(1)(A), (B), (C)).

10.     With respect to venue, § 3732(a) provides that "[a]ny action under section 3730 (Civil actions for false claims) may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 (False claims) occurred." Venue is proper in the Western District of Pennsylvania because Defendants maintain their principal places of business and operate their admissions and financial aid services within this District.

11.     This case is not based on a public disclosure.

## III. **PLAINTIFFS**

12.     ***Qui Tam* Plaintiff and Relator Michael Laukaitis** ("Laukaitis") is a citizen of the United States of America and a resident of the State of Pennsylvania. Beginning on February 2, 2009 and through June 20, 2011, Relator Laukaitis served as an Admissions Representative

("AR") for Education Management Corporation and The Art Institute Online. In this position, Laukaitis was responsible for contacting potential Art Institute Online students and guiding them through the application process. He also worked closely with students to complete the Free Application for Federal Student Aid ("FAFSA"). Laukaitis brings this action on behalf of the United States.

13.    *Qui Tam* **Plaintiff and Relator Gregory Carter** ("Carter") is a citizen of the United States of America and a resident of the State of Pennsylvania. Beginning on December 1, 2008 and through the present, Relator Carter serves as an employee of Education Management Corporation and The Art Institute Online. From December 1, 2008 through October 2009, Carter worked as an Admissions Representative and was promoted to the position of Senior Admissions Representative ("SAR") in October 2009 due to exceptional recruitment numbers. As an SAR, Carter is responsible for supervising approximately six to seven Admissions Representatives and ensuring the ARs meet their recruitment goals. Carter is also responsible for contacting potential Art Institute Online students and guiding them through the application and financial aid processes. Relator Carter is consistently ranked among the top Art Institute Online recruiters based on the number of students he places in Art Institute Online courses. Carter brings this action on behalf of the United States.

14.    *Qui Tam* **Plaintiff and Relator Oksana Hiser** ("Hiser") is a citizen and resident of the State of Pennsylvania. Beginning on October 27, 2008 and through December 2012, Relator Hiser served as an employee of Education Management Corporation. From October 27, 2008 through March 2010, Hiser served as an Admissions Representative with the Art Institute Online. In March 2010, she became a Student Finance Counselor ("SFC") with the Art Institute Online. As an SFC, Hiser was responsible for guiding students through the financial aid process

and ultimately securing financial aid packages. In September 2011, Hiser became a Web Strategies Business Analyst with EDMC's department of Online Higher Education ("OHE"), where she was responsible for student success projects. In January 2012, Hiser was promoted to the position of financial analyst in the Financial Analysis and Planning Department at EDMC's Corporate headquarters in Pittsburgh, PA. As a financial analyst Hiser was responsible for analyzing information pertaining to financial and student data.

15.    ***Qui Tam* Plaintiff and Relator Garland Richie** ("Richie") is a citizen and resident of the State of Pennsylvania. Richie is a decorated combat veteran of the U.S. Army who served in the Iraq War. He has 22 years of military service: 17 years with the Army National Guard and 5 years with the Air National Guard. Beginning on July 27, 2006 and through March 2012, Relator Richie served as an employee of Education Management Corporation. From July 2006 through June 2011, Richie served as an Admissions Representative with the Art Institute Online. In July 2011, he became an Admissions Representative with Argosy University Online. As an Admissions Representative, Richie was responsible for contacting potential students and guiding them through the application process. He also recruited and worked with potential students with ties to the U.S. Military. He also worked closely with students to complete the Federal Application for Federal Student Aid ("FAFSA"). Richie brings this action on behalf of the United States.

16.    ***Qui Tam* Plaintiff and Relator Sean Allen Lardo** ("Lardo") is a citizen and resident of the State of Pennsylvania. Lardo is a veteran of the U.S. Army. He has 8 years of military service: 4 years of active duty and 4 years with the Army National Guard. Beginning in September, 2006 and through July 2009, Relator Lardo served as an employee of Education Management Corporation. Lardo served as an Admissions Representative with the Art Institute

6

Online.   As an Admissions Representative, Lardo was responsible for contacting potential students and guiding them through the application process.   He also recruited and worked with potential students with ties to the U.S. Military.   He also worked closely with students to complete the FAFSA.   Lardo brings this action on behalf of the United States.

17.     *Qui Tam* **Plaintiff and Relator Jack Boring** ("Boring") is a citizen and resident of the State of Pennsylvania.   Beginning in 2006 and through summer 2013, Relator Boring served as an employee of Education Management Corporation.   Boring served as a recruiter, an Admissions Manager, and a Director of Admissions with the Art Institute Online.   As a Director, Boring worked directly for Carla Caldwell, a Vice President of Art Institute Online, who held daily meetings with her Directors.   Boring directly supervised a number of Admission Managers, who in turn managed the Admission Representatives.   Boring trained his subordinates as directed by EDMC management.

18.     *Qui Tam* **Plaintiff and Relator Chanel Dennis** ("Dennis") is a citizen and resident of the State of Texas.   Dennis is a veteran who served in the Army from 1997 through 2003 as an airborne paratrooper and later as an information technology technician.   Dennis was honorably discharged and is currently disabled as a result of migraines and arthritis she developed during her time in the military.   Dennis is the mother of three children.   In February 2010, Dennis enrolled as a full time student at AIO in the school's graphic design bachelor's degree program.   Dennis withdrew from the program in late October 2010, returned briefly in July 2011, and began full time again in December 2011.   Dennis continued in the graphic design program through May 2012, before taking a short break, and returning to her studies in September 2012.   Dennis permanently withdrew from AIO on December 6, 2012.   Throughout her time at AIO, Dennis received educational assistance through the VA and DOE.

19.    **The United States of America** is here named a plaintiff because funds of the United States of America were and are awarded to Defendants, pursuant to the HEA, Title IV, as a result of the false claims alleged in this Complaint.

## IV. <u>DEFENDANTS</u>

20.    **Defendant Education Management Corporation** ("EDMC") is one of the country's largest for-profit providers of post-secondary education. From July 2009 to June 2010, EDMC recruited and enrolled 131,933 new students and maintained an average student body of 125,826 students.  EDMC's total revenue in 2010 was approximately $2.5 billion, of which approximately $2.3 billion was generated solely from degree revenue.  In Fiscal Year 2011, EDMC recruited and enrolled 141, 331 new students (a 12% increase over FY10) and maintained an average student body of 150,772 students (a 14% increase over FY10).  During this same year, EDMC's revenue rose to $2.8 Billion, a 15% increase from 2010.  EDMC offers higher education through four universities, the Art Institutes, Argosy University, Brown Mackie College and South University.  EDMC also operates Online Higher Education ("OHE"), which provides higher education through three online colleges, the Art Institute Online ("AIO"), Argosy University Online ("AUO") and South University Online ("SUO").  EDMC maintains a principal place of business at 210 Sixth Avenue, Pittsburgh, PA 15222.  Each of the following defendants is a wholly owned subsidiary of EDMC.

21.    **Defendant Education Management, LLC** is a wholly owned subsidiary of EDMC, with a principal place of business at 210 Sixth Avenue, Pittsburgh, PA 15222.

22.    **Defendant EDMC Online Higher Education** ("OHE") operates EDMC's online schools, The Art Institute Online, South University Online and Argosy University Online. During the fiscal year 2010, OHE recruited approximately 46,988 new students between July

2009 and June 2010 and maintained an average student body of 32,278 students over this same period. OHE's revenue for this time period exceeded $456 Million. During the fiscal year 2011, OHE's average student body increased to 41,515 students (an almost 30% increase over 2010) and revenue increase to $528 million (a 23% increase over 2010). OHE maintains a principal place of business at 1400 Penn Avenue, Pittsburgh, PA 15222.

23.      **Defendant The Art Institute Online, Inc. a/k/a The Art Institute of Pittsburgh Online Division a/k/a The Art Institutes Online** ("AIO") is an online university, providing bachelors, associates and certificate degrees in sixteen different arts-based areas of study. AIO is accredited by the Middle States Association of Colleges and School, Commission on Higher Education. During Fiscal Year 2011, AIO recruited and enrolled approximately 18,329 new students and maintained an average student body of approximately 14,502 students. AIO has a principal place of business at 300 Sixth Avenue, Pittsburgh, PA 15222.

24.      **Defendant South University, LLC d/b/a South University Online** ("SUO") is an online university, offering associates, bachelors and masters level programs. SUO is accredited by the Southern Association of Colleges and Schools Commission on Colleges. During the fiscal year 2011, SUO recruited and enrolled approximately 26,764 new students and maintained an average student body of approximately 15,310 students. AUO has a principal place of business at 709 Mall Boulevard, Savannah, GA 31406.

25.      **Defendant Argosy Education Group, Inc. d/b/a Argosy University Online** ("AUO") is an online university, offering associates, bachelors, masters and doctorate level programs. AUO is accredited by the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges. During the fiscal year 2011, AUO recruited and enrolled approximately 15,190 new students and maintained an average

student body of approximately 11,700 students.  AUO has a principal place of business at 210 Sixth Avenue, Pittsburgh, PA 15222.

26.     The term "Defendants" will refer collectively to the aforesaid Defendants acting by and through their respective employees, agents, servants, representatives, apparent agents, and/or ostensible agents, including their managers and officers, all of whom who were acting within the course and scope of their employment, agency, servitude, representative capacity, apparent agency and/or ostensible agency, with the knowledge and consent of the Defendants, and each of them, unless otherwise indicated.

## V.  <u>SPECIFIC FALSE CLAIMS AND FRAUDULENT STATEMENTS</u>

### A.     SUMMARY OF DEFENDANTS' FRAUDULENT CONDUCT

27.     Under the HEA, the DOE provides financial assistance to students in need through a variety of different programs.  These programs include grants, loans, loan guarantees and interest subsidies under the Federal Pell Grant Program, the Federal Family Education Loan Program, the Federal Direct Loan Program, the Federal Perkins Loan Program, the Federal Work Study Program, and the Federal Supplemental Education Opportunity Grant Program.

28.     The disbursement of federal funds to post-secondary schools is contingent on the schools' statements of eligibility to participate in these programs and the students' submissions of federal financial aid requests to the government.  Typically, students request these funds by completing a Free Application for Federal Student Aid ("FAFSA").

29.     The Pell Grant program provides federal grant funds to assist students in financial need.  Pell Grants come directly from the DOE and are based upon the student's need as calculated by a strict statutory formula.  If the student qualifies for the grant, the DOE transfers

the Pell Grant funds directly to the school, which then credits these funds against the student's tuition.

30.    In addition to the grants themselves, the DOE also pays participating schools an administrative cost allowance of $5.00 for each student enrolled in the program to be used to pay the costs of administering the Pell Grant and other federal financial aid programs.

31.    The Guaranteed Student Loan Program ("GSL") includes both the Federal Family Education Loan Program and the Stafford Loan Program (both subsidized and unsubsidized), which provide for federally insured low-interest loans to qualified post-secondary school students in financial need.  Prior to July 1, 2010, students typically applied for loans from a private lender that met specific Title IV eligibility requirements.  In the event the student defaulted on the loan, the federal government reimbursed the lender or guarantee agency for all or part of the default claims paid plus any accrued interest and administrative costs.  However, after July 1, 2010, the federal government began loaning money directly to students in need under the Federal Direct Loan Program.

32.    For subsidized Stafford loans, the government pays the interest on the student's behalf during the time the student is enrolled in school on at least a half-time basis and during the student's grace period before repayment commences.

33.    If the student qualifies for the GSL program, the government or the private lender dispenses the financial aid funds directly to the schools, which then credit the funds against the student's cost of education.

34.    Students are responsible for repaying the loans upon graduation.  Students that do not finish school or are otherwise disqualified from an educational institution must still repay the federal loans.

i.     **The Program Participation Agreement**

35.    As a prerequisite to their participation in these Title IV programs and the receipt

of federal financial aid funds, schools must execute a Program Participation Agreement ("PPA"),

under which they agree to adhere to a number of federal provisions.  In executing the PPA,

schools certify, among other things, that:

a.   The school does not tie compensation for their admissions employees to their success in enrolling students or securing financial aid.  20 U.S.C. § 1094(a)(20).

b.   The school provides prospective students with accurate information concerning the true cost of attendance, including tuition, fees, and estimates for necessary books and supplies, and the procedures for withdrawing from school.  34 CFR § 668.43.

c.   The school provides prospective students with accurate information concerning their rights and responsibilities as recipients of financial aid funds, including the method in which the funds are disbursed and the student's repayment obligations for any federal loans.   34 CFR § 668.42(c); 34 CFR § 668.73.

d.   The school provides prospective students with accurate information concerning the school's graduation and retention rates and the success of its graduates in finding employment in their areas of study.  34 CFR § 668.45; 34 CFR § 668.41; 34 CFR § 668.74.

e.   The school does not receive more than 90% of its revenue from federal financial aid funds.  34 CFR § 668.28(a)(1).

36.    The PPA and attendant HEA regulations are meant to ensure the integrity of

educational institutions participating in the federal student aid program.  By executing the PPA,

colleges and universities certify that they are in the business of providing students with a quality

education and that they do not engage in questionable recruiting practices.  In turn, this ensures

that a potential student is making an independent, informed decision to attend college and that

the government will see some return on its investment in that student's education.

37.     In direct contravention of these requirements, Defendants compensate their admissions representatives based solely on their recruitment activities, conceal the true cost of attending their online schools, misrepresent the schools' graduation and retention rates, and misstate the success of their graduates.  What is more, Defendants' online schools receive more than 90% of their annual revenue from federal financial aid sources.

38.     Before the spring of 2012 as a Director of Admissions, Relator Boring signed off on numerous employee reviews in regard to paying employees for enrollment of students.  Before changing the pay structure, leadership went as far as to offer more money per student for their last review under the old pay structure, basing salary on how many students an employee enrolled.  This in return promoted high pressure recruiting that put whatever student one could into school.

39.     As a Director of Admissions and an Admissions Manager, Relator Boring performed numerous trainings for staff and relayed information that passed down to him through leadership huddles that he attended with the Regional Vice President Carla Caldwell and discussed how management would spin things to make it look like staff and recruiters were helping the student but in reality just skirting over important information necessary for a student to make a decision.

40.     As a recruiter, Admissions Manager, and Director of Admissions, Relator Boring was always trained and instructed to recruit at all costs and to rush students through the process to enroll them.  Management always trained on how to give just enough information to make it look like the whole picture was there while leaving out important information that could help a student make a decision.  All students were instructed to fill out Free Application for Federal Student Aid (FAFSA) forms no matter if they were in the military, paying cash, or both.

41.     Veterans are required to fill out the FAFSA even if they are eligible for and/or receiving VA benefits.

42.     Leadership, including Ms. Caldwell, found ways to punish staff and management when they did not get FAFSAs done, including taking students away from that employee and giving them to someone else who would do what was instructed.  Ms. Caldwell and staff, including Director of Student Financing Parker Charlton, held meetings on a regular basis to discuss tactics and approaches to get the FAFSAs filled out and have students moved through the process as quickly as possible regardless of whether the student had all necessary facts.  It was not disclosed to students with prior loan histories or with maximum financial aid that they still would not have enough money to actually finish their degrees.  They were just shown the first academic year and how much financial aid they could get now.  This left students in debt and with no degree.  They withdrew from school with balances.  Management and EDMC employees never disclosed up front about sending them to credit agencies once they failed to make payments.

43.     Based on Boring's knowledge, none of the students he enrolled during his tenure ever received career services from AIO/EDMC.

44.     Prior to 2011, each academic advisor at AIO was required to service approximately 1200 students, which was unrealistic and did not provide any meaningful opportunity for student counseling.  At present, each academic advisor is required to service approximately 200 students.

45.     As far as 90% of revenue being from federal financial aid, it sometimes was much higher because online money was reported with the ground campus.  When the number became too high, the president at the time, John Kline, held urgent meetings and trainings with

employees including Boring.  With the help of Mr. Charlton, trainings were put together to train staff and recruiters on asking students to make cash payments.  Recruiters then were told to ask for money up front on top of getting them all the financial aid possible.

46.     Although these problems exist at many of EDMC's ground campuses, they are rampant and pervasive at Defendants' online schools (AIO, SUO and ARO).  OHE perpetuates an aggressive sales mentality among its admissions representatives and compensates these recruiters, including Relators, based directly upon enrollment activities and enrollment numbers.

47.     OHE's recruiters seek to enroll students in their online schools at all costs.  In furtherance of this goal, admissions  representatives will provide students with false information about graduation and retention rates in order to portray the online schools in a positive light. Likewise, Defendants misrepresent the success of their graduates in finding employment in their areas of study, which suggests to potential students that they can be just as successful if they enroll in AIO, AUO or SUO.

48.     Defendants also seek to conceal  from students the total cost of attendance at their online schools and push students through the admissions and financial aid application processes without providing a full and accurate picture of their rights and responsibilities in requesting and receiving federal financial aid funds.  Defendants do not inform students that even if they qualify for the maximum amount of federal financial aid available, they will still be unable to pay for the entire cost of their degree program.  In essence, Defendants set up their own students to fail from the beginning by ensuring that they will be unable to afford the cost of their entire education. When the student exhausts their financial aid eligibility, they invariably withdraw from school without completing their degree and are left with a mountain of federal loan debt.

49.     Defendants' online schools are not in the business of providing quality educational services to their students, and are in fact a sales driven business whose goal is to funnel as much guaranteed federal money into EDMC as possible. As a result of this scheme, Defendants' online schools receive more than 90% of their annual revenue from federal financial aid funds, in direct violation of the PPA and HEA regulations.

50.     Defendants have direct and actual knowledge that they are in violation of the HEA when they certify their compliance each year by executing a PPA and continue to participate in the federal student aid program. Alternatively, Defendants act with deliberate indifference and/or reckless disregard as to the truth or falsity of their compliance with these requirements in executing a new PPA each year. As discussed at length below, Defendants are not qualified to participate in the Title IV, HEA program and their continued certifications of compliance constitute a fraud on the federal government. As such, Defendants are not entitled to any of the federal financial aid funds received under these falsely executed PPAs.

### ii.     Direct Fraudulent Conduct

51.     In addition to false certifications of compliance under the PPAs, Defendants directly defraud the federal government through the filing of false federal financial aid applications and the misuse of federal monies. Defendants guide prospective students through the FAFSA and misrepresent student income and assets in an effort to maximize the size of the financial aid package received by the student. Defendants' admissions representatives know that the lower the student's income and assets, the more guaranteed federal money he or she qualifies for. As such, Defendants omit relevant financial information from students' FAFSAs and make material misrepresentations on loan applications in order to maximize the amount of federal funds funneled into the schools.

52.     Walking students through their FAFSA applications was something Admissions staff always were instructed to do.  Students were instructed: "Don't worry, if you don't know the answers just fill it in and we can correct it later.  Let's just get this submitted," (or words to that effect).  This was what representatives were trained to do in order to get students linked with EDMC schools as quickly as possible.  Representatives were aware that they were trying to get students to understand that the less money they made, the more money they would get.  New positions for "finance intake specialists" also were implemented to walk each student through every document in order to have their financial aid processed quickly and maximally.

53.     Defendants will suggest "correct" answers to questions on the FAFSA in order to ensure that the student qualifies for the largest financial aid package possible.  Admissions representatives will even omit relevant financial information when the student tells them that the suggested answer is incorrect.  Defendants will also prepare the FAFSA for the student and then forge the student's signature to certify the veracity of the financial information contained therein, despite Defendants' knowledge that this information is incorrect.

54.     Moreover, Defendants have transformed a federal program designed to help students afford the significant expenses associated with higher education into a veritable "get-rich-quick" scheme.  At its most basic level, Defendants' business is not that of an educational institution.  It is a sales company.  Defendants place virtually no stock in providing students with quality educational services and therefore are not entitled to participate in the federal financial aid program.

55.     Defendants have direct and actual knowledge that they are submitting fraudulent student loan applications to the federal government and that they are not an educational institution entitled to participate in the federal financial aid program.  Alternatively, Defendants

act with deliberate indifference and/or reckless disregard as to the truth or falsity of the information contained in the student loan applications submitted to the government and their status as an educational institution.  At a minimum, Defendants are not entitled to any of the federal financial aid funds received as a result of the fraudulent student loan applications. However, Relators contend that Defendants' fraudulent conduct disqualifies it entirely from the federal financial aid program, and that the online schools are not entitled to receive any Title IV, HEA funds.

       iii.       **Fraudulent Participation in the VA Educational Assistance Programs**

56.     In addition to the funds provided under HEA and Title IV, the federal government provides financial educational assistance to active members and veterans of the armed forces through the VA.  The VA administers such programs as the Post-Vietnam Era Veterans Educational Assistance, the Volunteer Force Educational Assistance Program ("The Montgomery GI Bill"), Educational Assistance for Members of the Selected Reserve, and the Post-9/11 GI Bill.  38 CFR § 21.4001, *et seq.*

57.     Funds provided by the VA are typically guaranteed benefits awarded to veterans after specified periods of service.  Unlike Federal Direct Loans under Title IV, these funds do not need to be repaid to the government by the recipient, nor are they dependent on the recipient's financial state.

58.     The VA will not approve the enrollment of active duty or veteran military students in any school that uses advertising, sales, enrollment, practices, or candidate handbooks that are erroneous, deceptive or misleading by actual statement, omission, or intimation.  38 CFR §§ 21.4252(h); 21.7122(c); 21.9765.  Thus, participation in VA educational assistance programs is contingent on compliance with this requirement.

59.     Defendants' admissions and financial aid reps aggressively target prospective military students because VA educational assistance does not constitute "federal financial aid funds" under the 90/10 calculation.  Accordingly, this guaranteed military money is used to balance out the significant amounts of Title IV funds Defendants' online schools receive from the federal government.

60.     In furtherance of this goal, Defendants' admission representatives and financial aid counselors seek to enroll military students through the dissemination of false and misleading information.  Defendants purposefully decline to inform prospective and enrolled military students about the true cost of attendance at their online schools and refuse to explain nebulous fees that appear on students' tuition bills.  Defendants' admissions representatives also misrepresent graduation rates at the online schools and job prospects for graduates.  Further, Defendants falsely promise prospective military students that a degree from one of their online schools will guarantee an increase in rank and pay upon graduation.

61.     Defendants have direct and actual knowledge that they are falsely certifying compliance with VA regulations when they enroll military students in their schools. Alternatively, Defendants act with deliberate indifference and/or reckless disregard as to their right to receive VA funds.  Defendants' erroneous, deceptive and misleading statements, omissions, and intimations disqualify the schools from participating in the VA educational assistance programs.

      **iv.**      **While Defendants Reap the Rewards of their Fraudulent Conduct, Defendants' Students and the Federal Government Suffer the Consequences**

62.     Defendants have engineered a business aimed at maximizing the amount of federal educational assistance funds funneled back to the companies rather than one geared

towards providing quality educational services to students that may benefit from post-secondary education.    The importance Defendants place on increasing enrollment numbers pushes admissions representatives to pursue students that are unlikely to complete degree programs. Moreover, Defendants are aware from the very beginning that incoming students are unlikely to be able to afford the total cost of their degree program.

63.    While EDMC leadership understood that most recruited students would not be able to finish their programs, leadership still put many policies in place to punish employees and push them out of their positions if they did not meet aggressive recruiting goals.  As a Director of Admissions, Relator Boring, in his role as a Student Success Advisor, instructed his team to focus on the success of existing students in an effort to keep up enrollment, which resulted in not getting as many new enrollments at all costs.  Because of this approach, Relator Boring and others were pushed out by Ms. Caldwell, now a Vice President.  In daily director huddles with Ms. Caldwell herself, Boring and others who were focusing on attracting students who could be successful were ridiculed for not producing high enrollment numbers, as if it were a game. Moreover, nothing was put in place by leadership to account for gaps in money for students. Students simply were shown the door when they could not pay EDMC anymore, to leave school without their degree and with debt.

64.    Relator Boring observed a constant revolving door at EDMC for students.  All Defendants cared about was replacing any lost student with a new one to whom was disclosed all the same information, without taking the time or utilizing adequate resources to help students who wanted to finish their degrees.  The business model contemplated students ending up in unfavorable situations, and kept working, with new enrollments replacing the ones that were forced to drop out.

65.     As students realize that they will not receive a quality education at Defendants' schools, they drop out in large numbers without completing their courses of study.  The students are then frequently left in the same exact position that they were before they enrolled in Defendants' schools: unemployed and without a degree.  However, the student is now in possession of a substantial amount of student loan debt that they are required to pay back to the federal government.  Without a well-paying job in their area of study, students are unable to make their loan payments and default on their repayment obligations at an alarming rate.  In turn, the federal government loses the money it invested in the students' education.  However, Defendants laugh all the way to the bank while they are allowed to retain the federal educational assistance funds and recruit a new round of unsuspecting students the following semester.

## B.     DEFENDANTS ARE NOT IN THE BUSINESS OF PROVIDING QUALITY EDUCATIONAL SERVICES

66.     By Defendants' own admission they are not an institution focused on providing quality educational services.  John Kline, the President of OHE, told Relators Carter and Laukaitis at a companywide meeting in 2010 that EDMC is a "sales driven company."

67.     Defendants take this characterization to heart and have engineered a money making scheme designed to enroll as many students as possible in an effort to funnel massive amounts of federal financial aid into the schools' coffers.  Defendants spend enormous sums of money advertising their schools and locating potential students but spend only a fraction of this amount to provide the students with an education.

68.     Relators Carter and Laukaitis state that admissions representatives are rarely contacted by students who have an interest in attending Defendants' schools.  Instead, a vast majority of students are directly contacted by Defendants' recruiters and pressured into enrolling.

21

Unlike traditional colleges where students apply for admission and wait for an acceptance decision, Defendants flood prospective students with calls until they apply to school and receive substantial financial aid packages.

69.     Defendants refer to potential students as "leads" and aggressively pursue these leads until they are enrolled in Defendants' online schools. Defendants' generate leads through online and print advertising, but also contract with third-party companies known as "lead vendors" to identify potential students. These lead vendors provide Defendants' admissions recruiters with large lists of students who may or may not actually be interested in Defendants' schools. The recruiters then spend hours each day cold calling these leads, inundating students with telephone calls until they fill out admissions and financial aid applications. In some instances, the vendors initiate contact with the potential student and then transfer the student directly to Defendants' admissions counselors in a three-way telephone call, earning as much as $40 per student.

70.     As a Director of Admissions, Relator Boring actually was on a special project with Ms. Caldwell to come up with a new aggressive way to call and email these so-called "leads" until EDMC made contact and recruited them. The sole objective was to make contact and make the sale at all costs. It did not matter how many times the leads were called or emailed; Relator Boring was told all that mattered was that they get them on the phone and make the sale.

71.     Lead vendors uncover potential students from a variety of different sources. The student may have clicked on an online advertisement for college or filled out a survey highlighting their interest in higher education. However, many of Defendants' students never expressed an actual interest in attending school before being contacted by Defendants' recruiters.

72.     Defendants utilize a calling system known as "PACE," which automatically dials a potential student's phone number as soon as they click on marketing materials for Defendants' schools or submit an inquiry through one of Defendants' websites.   The hope is that if Defendants can get the potential student on the phone with a recruiter while he or she is still sitting at their computer, they can be enrolled in school and apply for financial aid within a matter of minutes.   This is easier than cold calling the student hours or even days after they initially clicked on an advertisement and then convincing them to attend school.

73.     Furthermore, Defendants' lead vendors will post fake job opportunities on employment websites, detailing the supposed requirements for the position, and listing a phone number for applicants to call.   When an individual calls the number they are either connected to a lead vendor or directly to Defendants' recruiters.   The individual then states that they would like to apply for the posted job.   The lead vendor or recruiter will then inform the individual that they do not possess the requisite educational background for the position.   The lead vendor will then transfer the person to Defendants' recruiters who detail how enrolling in one of Defendants' schools could provide the student with the required educational qualifications and prepare them for the type of job that they thought they were applying for in the first place.

74.     Recruiters also tell students that they will be unable to find a job without a college degree as most companies today require that new hires have some form of post-secondary education.   The recruiters will then ask the student how long they have been looking for employment and tell the student that, with a degree in hand, they would not be currently searching for work.

75.     The focus of Defendants' business becomes clear when you look at the numbers involved in their recruiting practices.

76.     Defendants will pay upwards of $25,000 in marketing and advertising costs to attract each potential student.  In turn, Defendants spend only a fraction of this amount of money to educate the student once they enroll.  Lacking a physical ground campus, OHE schools operate with incredibly low overhead and some teachers are paid as little as $1,500 for each five and a half week course they teach.  Moreover, OHE's teachers are referred to as "facilitators" rather than educators and they simply supply students with pre-written responses to their class assignments.

77.     In fact, Defendants have calculated that a full-time student pursing a bachelor's degree pays for the total cost of their program within the first semester and a half of study (approximately 16.5 weeks).  The remaining three years and eight months of tuition payments are purely profit for the schools.  Nevertheless, Defendants charge students as much as $90,080 to complete a bachelor's degree at their schools (e.g. AIO).

78.     Furthermore, OHE employed approximately 1,489 recruiters for their online schools in 2010.  When this number is compared to the total number of new students Defendants added in 2010 (46,988), it works out to approximately one recruiter for every 32 new students.  Moreover, OHE employed only 337 full time instructors and 901 other full-time staff during 2010.  This means that recruiters accounted for approximately 55% of OHE's total full-time staff.  These numbers clearly illustrate that Defendants operate a business focused on sales rather than providing students with quality education.

79.     Defendants maintain that they are "changing lives" since they are providing quality educational services to students who may not be able to attend traditional colleges.

80.     However, it is not by accident that Defendants position their online schools as the perfect choice for non-traditional students, including single parents, the disabled, and people who

cannot find work. Defendants know that these people typically have little to no income and assets and therefore qualify for financial aid packages that include substantial amounts of guaranteed federal monies.

81.     Defendants' employees quip that the schools are actually "changing lives for the worse" because they push students that are not ready for the rigors of college into their schools and set them up for financial ruin when the student inevitably fails to complete their program of study.

82.     The current graduation rate for Defendants' online schools is 1%. The constant student turnover and low graduation rates mean that students are left without a degree and are unable to find gainful employment in their fields of study. Ultimately the student is left right back where they started before they were contacted by Defendants' recruiters, save for one important difference. The student is now saddled with large sums of federal loan debt that is virtually impossible to discharge and, without a well-paying career in their field of study, ultimately defaults on their repayment obligation. As a result, the federal government is unable to recoup the federal aid monies paid towards the students' education while Defendants retain the funds and experience soaring profits.

83.     For example, 15.4% of AIO students who had entered the repayment period for their federal student loans had defaulted on those loans in 2009. This means that 1,155 students at AIO alone could not meet their repayment obligations to the federal government in 2009. This 15.4% default rate was up from 7.9% in 2008 and 6.8% in 2007, illustrating a problem of increasing severity. (AIO Default Rates, Exhibit 1).

**C.    DEFENDANTS        COMPENSATE        ADMISSIONS REPRESENTATIVES BASED ON THE NUMBER OF STUDENTS THEY ENROLL IN THEIR ONLINE SCHOOLS**

84.    20 U.S.C. § 1094(a)(20) states that colleges may not "provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons." This is known as the incentive compensation ban, which prevents schools from tying recruiter compensation to the number of students they enroll.

85.    In direct violation of this statute, Defendants compensate their enrollment counselors, including Relators, based on the number of students they enroll in Defendants' online schools. Specifically, Defendants provide employees with a chart, known as the "matrix," which sets forth the exact number of students that an admissions representative must enroll in order to earn a specified salary. (The Matrix, Exhibit 2). Recruiters earn a set number of points for each student they "confirm" during an enrollment period, and they can then look to the matrix to see what their salary will be for the coming enrollment period as a result of the number of points earned. The matrix has been in use for as long as Relators have been employed by EDMC, and as they understand it, the matrix has been used to calculate recruiter compensation since Defendants started providing education programs.

86.    Admissions counselors, including Relators, undergo a performance review every six months, at which time supervisors tally the total number of students the recruiter has "confirmed" over the past six months and then plug this information into the matrix to ascertain the recruiters' salaries. A confirmed student has traditionally been worth three points on the matrix but recruiters also earn varying points for referring students to different schools within EDMC (i.e. a brick and mortar campus location or another online university).

87.    As a Director of Admissions, Relator Boring constantly was tasked with getting anyone that had high success recruiting into a management position. He along with the other directors and Ms. Caldwell, Vice President of the Art Institute Online, Jessi Buechel, Director of

Academics, and Mr. Charlton, Director of Student Financing, held interviews for these positions and no matter if there was a better candidate or not, Ms. Caldwell selected candidates whom she felt would recruit the most students. Employees who helped students succeed in class and progress to graduation but were not recruiting as many students were disfavored by Ms. Caldwell even to the extent of fixing reviews to make it look as if they did not have competencies.

88. As a Director and recruiter, Relator Boring learned all that mattered was confirming a student and then one never spoke to the student again, since at that point the school was getting money and financial aid from the student, who counted in enrollment numbers that were reported to the investors who owned the company. Relator Boring confirmed hundreds of students and that was all that mattered, and not their success down the road. Relator Boring was trained to walk students through posting an autobiography about themselves and then to let them go, because at that point they were confirmed for the numbers reported.

89. The more students a recruiter confirms during a six month period, the more federal aid money is channeled to Defendants. Successful recruiters are promoted to higher positions within Defendants' companies, while those counselors who repeatedly fail to meet the required number of "confirmations" per review period are forced out of the company.

90. Defendants define a "confirmed" student as one that has enrolled in their first class, completed the initial assignment and responded online to two other student's initial assignments. However, virtually all incoming students take "Strategies for Online Learning" as their first class. This is a non-rigorous, introductory course meant to familiarize students with online higher education, and the initial assignment consists solely of writing a short autobiography about oneself and providing a brief statement in response to two other students'

autobiographies. This assignment requires only a couple of minutes outside of class and must be completed within the first week.

91.    Recruiters hound potential students to apply to school, push them through the financial aid and admissions processes, and ensure they complete their first assignment so that they are deemed "confirmed." In fact, Defendants instruct admissions counselors to call enrolled students, explain how to post the initial assignment online and then remain on the phone with the student until he or she completes the autobiography, posts it to the course website, and responds to another student's project.

### i.    Defendants Create a Recruiting Culture Obsessed with Numbers

92.    Training materials received by Relators Carter and Laukaitis break down the exact number of calls, "quality conversations" and applications that a recruiter must make in order to get a student confirmed. (Admissions Math, Exhibit 3). These materials also use the matrix to help recruiters track exactly how much their salary will increase with each enrollment.

93.    Defendants' supervisors meticulously track each admission counselor's enrollment activities including, *inter alia*, the total number of calls a recruiter makes during a given week and the actual amount of time he spends talking on the phone during each call. (10/19/10 Keith Perry Email, Exhibit 4; Weekly Training Logs, Exhibit 5). Defendants place significant emphasis on a counselor's ability to "close," and the defendants closely monitor the percentage of calls that ultimately result in a "confirmed" student. (10/22/10 Corey Rethage Email, Exhibit 6; 9/9/10 Keith Perry Email, Exhibit 7).

94.    Defendants also circulate a weekly email, ranking recruiters by the number of students they have confirmed during the past seven days. (10/6/10 Renee Huddy Email, Exhibit 8). Each week, admissions counselors are assigned a colloquial designation depending on their

enrollment activities. Recruiters are categorized as a "Superstar," "Rising Star," "Steady Eddie," "Tune-up" or "Wake-Up Call" based on their weekly calls, talk time and ability to convert leads into confirmed students. (Performance Management and Coaching Worksheet, Exhibit 9). Recruiters are also urged to increase the number of calls they make to potential students in a given week and increase the amount of total time they spend on the phone urging the students to attend Defendants' schools. Admissions representatives can then graduate from a "Bench Player" to "Baller Status" as they increase their recruitment activities. (Good Activity Worksheet, Exhibit 10).

95.    Defendants provide employees with a spreadsheet "calculator" into which recruiters can enter their current number of student applications and confirmations to determine how many more students the recruiter must enroll to be eligible for a specified salary increase. (Calculator, Exhibit 11). The calculator explicitly assigns a monetary value to each student a recruiter enrolls and each application he generates. An admissions counselor is therefore able to calculate exactly how many more students he needs to confirm in order to obtain a salary increase on the matrix.

ii.    **Defendants Actively Seek to Conceal the Fact that the Compensation Scheme is Based Solely on Recruiters' Enrollment Numbers and Activities**

96.    Defendants attempt to conceal the true nature of their numbers based compensation scheme by performing a "qualitative" job performance review of each admissions counselor at the end of the enrollment period. Recruiters are evaluated by their immediate superiors who then assign them "qualitative" points that place the admissions counselor in one of five categories: "Unsatisfactory," "Needs Improvement," "Meets Expectations," "Highly Effective" and "Outstanding." These categories correspond with the upper axis on the matrix.

Supervisors then combine these qualitative points with the number of students confirmed during the period to determine the recruiter's new salary.

97.     The use of job performance evaluations and "quality" points in determining recruiters' salaries allows Defendants to maintain that compensation is not based *solely* on enrollment numbers and, therefore, does not run afoul of HEA and DOE regulations. However, closer examination of the evaluation and compensation determination process belies this contention.

98.     Virtually all employees achieve "Meets Expectations" status so long as they show up and work towards their enrollment goals. Unless an employee takes an unreasonable number of days off, he is unlikely to sink below the "Meets Expectations" level. Conversely, top recruiters will not fall below "Meets Expectations" if they fail to comply with Defendants' attendance policies because admissions managers are reluctant to penalize or terminate the employees who ensure they meet their own recruitment goals.

99.     Likewise, a recruiter is unlikely to achieve "Highly Effective" or "Outstanding" status unless he significantly exceeds his recruitment goal for the enrollment period. This has the effect of confining potential employee compensation to those salaries listed in the "Meets Expectations" column, transforming the matrix into a single-axis chart and eliminating any sort of qualitative review from the equation.

100.    The matrix places significantly more weight on the number of students a recruiter confirms during a review period than any sort of qualitative evaluation of their job performance. A recruiter can more easily increase his salary by adding a few additional students and moving within the "Meets Expectations" column than he can by moving from "Meets Expectations" to "Highly Effective" and maintaining the same number of confirmed students.

30

101.   Despite being provided with a form meant to evaluate the qualitative skills of Defendants admissions representatives, Defendants' supervisors often fail to conduct comprehensive assessments.  Supervisors often seem rushed or annoyed at having to fill out the performance evaluation form.  Relator Carter has had at least one performance evaluation in which his supervisor, Keith Perry, declined to even complete the assessment, leaving approximately 80% of the form, including a majority of the qualitative factors, blank.  (11/3/09 Carter Performance Evaluation, Exhibit 12).  Despite this, Carter continued to earn substantial salary increases as a result of incredible recruitment numbers.

102.   Even where supervisors conduct actual performance evaluations, recruiters' "Quality Points" are based exclusively on their enrollment activities.  Specifically, the reviews consider whether the admissions counselor met his/her confirmed student goal outlined at the start of the previous enrollment period and how successful he/she is at transforming leads into enrolled students.  Recruiters that consistently meet or exceed the enrollment goals established by their supervisors earn increased salaries and promotions, while those who fail to attain their recruitment goals are subject to ridicule and eventually forced out of the company.

103.   Relator Laukaitis frequently failed to meet his recruitment goals for the specified enrollment periods and was even placed on probation for not confirming enough students during a particular six-month period.  After repeatedly missing his recruitment goals, Relator Laukaitis was terminated from his employment as an admissions representative on June 20, 2011.

104.   Present at Relator Laukaitis's termination meeting were Keith Perry, Laukaitis's direct supervisor, Kristin Woods, the director for Laukaitis's team, and Tracy Holtz, a human resources representative.  These individuals informed Laukaitis that the decision to terminate

him was based solely on his failure to enroll the specified number of students in AIO. No qualitative considerations or allegations of misconduct were discussed during the meeting.

105.    In addition to the threat of termination, struggling recruiters are humiliated and chastised by their supervisors. Specifically, Defendants instituted a "Wall of Shame" on which they place pictures of admissions coordinators that are "Not Quite There..." in terms of confirming an acceptable number of students per enrollment period. ("The Door of Not Quite There...," Exhibit 13).

106.    Conversely, Relator Carter has excelled as an admissions representative, frequently exceeding his enrollment goals. (Carter Accolades, Exhibit 14). In turn, he has been promoted and exponentially increased his salary over the past four years. He is currently a Senior Admissions Rep with AIO, and is responsible for overseeing approximately six to seven Admissions Representatives and ensuring the ARs meet their recruitment goals. In addition to this supervisory role, Relator Carter continues to recruit prospective students and guide them through the school and loan application processes. Throughout his employment, Carter was frequently ranked number one out of approximately 600 AIO recruiters as a result of his enrollment numbers and is likely to be promoted to the level of Second Director within the year.

107.    In addition to promotions and greater compensation, Defendants frequently praise the top performing recruiters through emails sent to all admissions employees and provide free meals for counselors that achieve specific recruiting goals. (10/22/09 Christopher Smith, Email, Exhibit 15).

108.    Moreover, Defendants were aware that the DOE planned to implement new regulations in 2011 eliminating the so-called "safe harbor" provision at 34 C.F.R. § 668.14(b)(22)(ii)(A). However, rather than discontinue the matrix immediately, Defendants'

Vice President Walid Kakoush actually announced in November 2010 that confirmed students would now be worth "4" points instead of 3. This shift in policy allowed recruiters to earn greater salaries while enrolling the same number of students, thus providing Defendants' admissions counselors with increased incentive to "confirm at all costs" before the new regulations came into effect.

109. Nevertheless, Defendants' recruiter compensation scheme violated the statutory ban on incentive compensation from the time it was designed and implemented through the present. As outlined at length above, Defendants relied solely on enrollment numbers to determine and adjust recruiter compensation in violation of 20 U.S.C. § 1094(a)(20) and were not subject to any alleged "safe-harbor" protection.

110. What is more, Defendants continue to base recruiter compensation on the number of students that admissions representatives enrolled in Defendants' online schools.

111. On February 7, 2012, senior director Levi Jacobs sent an email to AIO's recruiters detailing the schools' second quarter enrollment numbers. (2/7/12 Levi Jacobs Email, Exhibit 16). Contained in the email is a chart that details, among other things, the number of leads each recruiter received during the quarter, the number of students they convinced to apply to AIO, and the number of students each recruiter confirmed.

112. On April 16, 2012 Carla Caldwell forwarded an email to Relator Carter written by AIO director of admissions Jake Godec. (4/16/12 Carla Caldwell Email, Exhibit 17). The email was meant to motivate AIO Pittsburgh recruiters to generate more student applications because they were behind AIO's Phoenix recruiters for applications on the day. Specifically, Godec stated that he wanted AIO Pittsburgh recruiters to get 35 applications before the end of the day. Notably, these emails were both sent after 6:00 PM on April 16, 2012, when Defendants'

compliance department had already left for the day and the AIO recruiters could then use any means necessary to convince students to apply to school.

**D. DEFENDANTS PERPETUATE LIES AND MATERIAL MISSTATEMENTS IN ORDER TO CONVINCE POTENTIAL STUDENTS TO ENROLL IN THEIR SCHOOLS**

113.    As a result of Defendants' employment compensation scheme and the push to enroll as many students as possible in the online schools, admissions representatives and financial aid counselors are instructed to "close" students at all costs. Defendants' employees are trained to mislead potential students about the true costs of tuition and the value of their degree upon graduation. Admissions representatives will also dangle federally funded stipends in front of hesitant students in order to secure their enrollment in school and the receipt of federal student aid funds by the schools.

114.    Defendants' admissions and financial aid process is finely tuned to push as many potential students into class while also securing the largest federal financial aid package for each student. Admissions counselors are encouraged to call a single student as often as it takes to ensure they complete their enrollment applications and FAFSA.

115.    Defendants also direct recruiters to use their personal cell phones to contact prospective students outside of Defendants' offices. This allows recruiters to contact potential students without worrying whether Defendants' compliance department and/or the DOE are listening in on their conversations.

116.    The use of private cell phones also prevents potential students from identifying whether incoming calls originate from one of Defendants' schools. Students who have decided not to attend often attempt to duck calls from recruiters and financial aid counselors out of fear that they may be pressured into enrolling. However, if the student is unable to identify the origin

of the call, he may answer it unsuspectingly, only to be badgered into signing up for courses and completing a federal student aid application.

117.    Mark Wilhelm, an assistant director at AIO, informed Relator Laukaitis that he could use his cell phone to call prospective students so long as he did not do it on the sales floor. Lauakaitis subsequently used his personal cell phone to contact students in the hallways and parking lots of AIO and at his home.

118.    Defendants also instruct admissions representatives to wait until after 6:00 PM, when the compliance department leaves for the day, to make calls to students that may be particularly difficult to close.  Some recruiters work until 11:00 PM to ensure that potential students complete the admissions and financial aid processes.

     **i.     Defendants Utilize a Number of "Sales Techniques" to Push Students Through the Admissions Process**

119.    Once they get a potential student on the line, Admissions representatives have been directed to conceal material information from the students about the true costs associated with attending Defendants' schools.  Defendants' employees have also been trained to mislead potential students about the value of their degree by lying about graduation and employment rates.

120.    Defendants train recruiters to employ high-pressure sales techniques and coach employees on how to overcome students' concerns and reservations about the online schools. An October 22, 2010 email from Masai Turner, AIO's director of training, to Relator Carter provides an in-depth critique for admissions managers and their recruiting teams.  (10/22/10 Masai Turner Email, Exhibit 18).  Turner praised teams who did not allow students to push them "off the phone early with initial smokescreens" (i.e. reasons for not enrolling in school) and

35

commending others with "healthy business" (i.e. high enrollment numbers). Turner also offered guidance to those teams that were having difficulty converting calls into confirmed students.

121.    Defendants provide recruiters with talking points to overcome prospective students' common concerns about enrolling in Defendants' online schools (i.e. the significant cost involved in online higher education, the inability to transfer credits to other universities, and the chances of employment upon graduation).    (Overcoming Objections, Exhibit 19). Defendants refer to this process as "overcoming objections" and they coach recruiters to figure out ways to get students to complete their application and FAFSA in a single day to ensure that they enroll and request financial aid.  Other training materials outline ways that recruiters can push prospective students through the application processes faster and prevent "buyer's remorse" after the student realizes they have just enrolled in school and incurred significant federal loan debt. (Start Rate 101, Exhibit 20).

122.    At EDMC, Admissions Representatives were forced to enroll students whom they knew did not have any chance whatsoever of completing the program.

123.    Those students included individuals who did not own a computer and, thus, realistically would be unable to successfully complete an online degree program.

124.    They also included students with learning disabilities who, based on their apparent learning deficits, would be unable to complete the necessary coursework even with assistance.

125.    Admissions Representatives would be threatened with written reprimands if they objected to enrolling these students or a supervisor would take over the application process for them and enroll the student.

126.    In other words, Defendants instruct their employees to turn a *reservation* that a student may have about attending school into a *reason* to attend school.  For instance, if a potential student expresses concern about whether he or she would be able to afford tuition at one of Defendants' schools, admissions representatives will reply, "well if you enroll and complete a degree program, you will definitely find a job and make more than enough money to pay back your student loans."

127.    Masai Turner, and Paul Ruoti, a second director at AIO, specifically trained Relator Laukaitis in these techniques during the first three weeks of his employment.  Ruoti referred to overcoming potential students' objections as "being the doctor" because the recruiter solves any potential problem.

128.    At one point, Relator Laukaitis was directed to inundate a prospective student who did not own a computer with calls until the student received his financial aid package and enrolled in AIO.  When the student, who lived in Alaska, asked how he would be able to complete the online coursework without a computer, Laukaitis suggested he drive to a nearby library to use their computers.  When the student indicated that he did not own a car, Laukaitis asked his supervisor, Keith Perry, for assistance in convincing the student to enroll in AIO. Perry then directed Laukaitis to tell the student to walk to the library, which was several miles from his home.

129.    Relator Laukaitis remembers another prospective student, identified herein as "M.P.," who would not complete his admissions and financial aid applications.  At the direction of Keith Perry, Laukaitis actually boarded a bus and met M.P. at a McDonald's, where Laukaitis completed the admissions and financial aid documents for the student.  M.P. only attended AIO for a short period of time before withdrawing and failing to complete his degree program.

ii.    **Defendants' Set Their Own Students Up to Fail**

130.    To qualify for participation in the Title IV, HEA financial aid program, Defendants must make information regarding their schools readily available to enrolled and prospective students.  34 C.F.R. § 668.43.  This information includes, but is not limited to:

(1) The cost of attending the institution, including—

(i) Tuition and fees charged to full-time and part-time students;

(ii) Estimates of costs for necessary books and supplies;

(iii) Estimates of typical charges for room and board;

(iv) Estimates of transportation costs for students; and

(v) Any additional cost of a program in which a student is enrolled or expresses a specific interest;

(2) Any refund policy with which the institution is required to comply for the return of unearned tuition and fees or other refundable portions of costs paid to the institution;

(3) The requirements and procedures for officially withdrawing from the institution...

Id.

131.    Likewise, Defendants must inform students of the rights and responsibilities associated with receiving federal financial aid under the Title IV, HEA programs.  34 C.F.R. § 668.42(c).  Defendants are required to specifically outline:

(1) Criteria for continued student eligibility under each program;

(2)    (i) Standards which the student must maintain in order to be considered to be making satisfactory progress in his or her course of study for the purpose of receiving financial assistance; and

(ii) Criteria by which the student who has failed to maintain satisfactory progress may reestablish his or her eligibility for financial assistance;

(3) The method by which financial assistance disbursements will be made to the students and the frequency of those disbursements;

(4) The terms of any loan received by a student as part of the student's financial assistance package, a sample loan repayment schedule for sample loans and the necessity for repaying loans...

Id.

132.    Pursuant to federal regulations, a school commits a misrepresentation if it makes false, erroneous or misleading statements concerning, *inter alia*:

(c) The cost of the program and the institution's refund policy if the student does not complete the program;

(d) The availability or nature of any financial assistance offered to students, including a student's responsibility to repay any loans, regardless of whether the student is successful in completing the program and obtaining employment...

34 C.F.R. § 668.73.

133.    Despite these requirements, Defendants' admissions representatives and financial aid counselors have been explicitly directed to keep the full costs of tuition from prospective students.  Management has told employees that they are not to inform the students of the true cost of their education or the size of their federal financial aid package unless explicitly asked by the student.  Employees will therefore attempt to guide students through the admissions and financial aid processes without ever telling them the amount of money that they are required to pay to the school or repay to the government.

134.    The ability to conceal the true educational costs and loan repayment obligations from potential students is particularly easy in light of the high-pressure sales techniques employed by Defendants' admissions representatives.  Students are inundated with calls and frequently caught on the phone while driving or engaged in some other activity that distracts them from the admissions and financial aid processes.  Prospective students are typically rushed

through these processes in less than fifteen minutes, and many are unaware of the financial commitments they have made to the school or the federal government.

135.    This is particularly troublesome given the exorbitant cost of attending Defendants' online schools and the limited financial means of many of the schools' students. As a result of the high tuition, a vast majority of Defendants' students require financial aid to pay for their entire cost of attendance. However, students are never told the maximum amount of federal financial aid that they can receive from the federal government, nor are they told that this amount will never be enough to cover the full cost of completing a bachelor's degree program at one of Defendants' schools.

136.    Defendants' recruiters and financial aid counselors are trained to dodge questions about the full cost of tuition and the amount of federal aid they will receive. If a potential student asks about the cost of their entire degree program, Defendants' employees will not give them an exact number and will instead say that the total cost is dependent on the federal financial aid they qualify for and that this amount may change from one year to the next.

137.    A typical undergraduate student is only eligible to request $57,500 in federal student loans to be used towards an undergraduate degree and, provided they qualify for the program, the student can receive a maximum total PELL grant of $22,200 over four years. That means an undergraduate student can receive a total federal financial aid package of $79,700 towards their degree.

138.    At Defendants' online schools, however, the cost of a four-year Bachelor's degree program for a student attending full time vastly exceeds the maximum amount of federal financial aid that a student can hope to receive.

139.   For example, the cost of a bachelor's degree program for a full-time student at AIO is between $97,568 to $139,312, including tuition, fees, books and living expenses for the period of enrollment.  Tuition and mandatory fees alone account for $90,880 of that amount.

140.   As such, even if the student qualifies for a full financial aid package, including a Pell grant, he or she will still fall anywhere from $17,868 to $59,612 short of paying for their degree.  This gap is closer to $40,068 to $81,812 if the student does not qualify for the federal PELL grant.

141.   EDMC trained its Admissions Representatives to deflect questions about the true cost of attendance.  As to cost questions, Admissions Representatives told applicants that "the cost is different for everyone," that "it varies," and/or that "it was dependent" on the amount of the individual's federal funding eligibility.  Admissions Representatives provided only a 1 year cost plan, in which federal funds typically were available to cover the entire tuition cost plus expenses.  The Admissions Representatives would not provide a plan for more than 1 year, thereby hiding the fact that federal funding was not available to cover the entire cost of a degree.  The maximum amount of federal funding is approximately $57,000 and the total cost of degree is approximately $90,000, resulting in a built-in federal funding shortfall of approximately $33,000.  Often, enrolling students already used up a significant portion of the available $57,000 in federal funding and, thus, the federal funding shortfall for them was even greater.  However, Admissions Representatives would not make them aware of these shortfalls.

142.   Admissions representatives and financial aid counselors will also frequently encounter students who have exhausted a portion of their maximum federal financial aid eligibility while pursuing a degree or certificate program at a prior university.  Again, Defendants' employees decline to inform these students that they will not have enough federal

41

aid to pay for the cost of their program of study at Defendants' schools. Nevertheless, Defendants' recruiters push these students into programs that will be impossible for the student to afford in light of their limited eligibility for federal financial aid.

143.    Defendants' continuous academic year further ensures that incoming students will be unable to pay for the cost of their complete education.

144.    The academic year at traditional colleges typically consists of two fifteen-week semesters or three five-week quarters. In turn, the DOE designs federal financial aid packages to coincide with these class schedules.

145.    The academic year at Defendants' schools, however, consist of four quarters, which means students attend school for an entire calendar year. In light of the fact that the federal financial aid packages are designed to cover three quarters and not four, this leaves one quarter of tuition per calendar year that is not covered by financial aid. Defendants count this fourth quarter as the start of a new academic year, which allows the student to qualify for a new academic year's worth of financial aid funds while still maintaining their enrollment for a full calendar year. This process, however, causes students to use up their total federal financial aid eligibility at an alarmingly quick pace.

146.    Take for instance a full-time student enrolled in a four-year bachelor's degree program at AIO, and who qualifies for the maximum amount of federal loan funds ($57,500). As a result of the required course load and fees, this student would exhaust his federal loan eligibility half way through his third year of study. This would leave the student unable to use federal loan monies to cover the cost of the remainder of his or her third year of study and the entire fourth and final year of the degree program.

147.    A part-time student enrolled in a bachelor's program at AIO, and receiving the maximum amount of loan funds, is placed in an even deeper hole.  Given the required course load, it would take a part-time student 6.5 to 7.5 years to complete their degree program.  Not only do Defendants' admissions representative fail to inform students that it will take this long to graduate, but they decline to tell the students that they will exhaust their federal loan eligibility shortly after completing their fourth year of study.  This leaves the student responsible for paying the cost of tuition for their final 2.5 to 3.5 years of study out of their own pocket.

148.    What is more, AIO charges students more money per credit as they advance through the degree program, forcing the students to exhaust their federal financial aid eligibility at an increasingly quick rate as they work towards graduation.

149.    Defendants' efforts to enroll students at all costs have the effect of widening this payment gap even further.   Admissions representatives are frequently confronted with prospective students who not only have trouble affording Defendants' high cost of tuition, but also their monthly bills.  Turning this problem into a solution, the admissions representatives will then convince the students to enroll in school part-time but request additional federal financial aid funds above and beyond those required to cover their tuition and fees.  Once the funds are disbursed to the school, this excess amount is then refunded to the student in the form of a stipend.  The amount of this stipend can vary significantly based on the size of the students' financial aid package and course load; however it may be as much as $2,000 per academic year (i.e. three quarters at one of Defendants' online schools).

150.    Selling a stipend, according to Relator Boring, was considered a surefire approach to get a student to enroll.  Since his first day at EDMC, he was trained to understand that a

stipend could entice a student who may be struggling financially stay enrolled in school and receive extra money to use how they want.

151.    Admissions representatives then use the stipend as a means to entice reticent students to enroll in Defendants' schools.   Defendants' employees readily suggest that prospective students use these federal funds for non-educational expenses, including everything from paying off credit cards to going on vacation.

152.    On one occasion, Relator Laukaitis inundated a potential student with calls in an attempt to enroll him in the Art Institute Online.  The student, identified herein as "P.A.," indicated that he could not enroll in school because he could not afford it, and in fact needed money to repair the transmission on his car.  Relator Laukaitis then told P.A. that if he enrolled in AIO part-time and received a stipend, he could use that money to fix his car.  The student ultimately relented and enrolled in AIO, receiving a sizeable financial aid package, which included a stipend of approximately $2,000 that P.A. then used to fix his car.

153.    Defendants' use of stipends as an incentive to attend school and the push for part-time enrollment causes students to run through their federal financial aid eligibility at an even quicker rate, virtually ensuring that they will be unable to afford the total cost of their education.

154.    Again, Defendants' are acutely aware that their practices ensure that students will be unable to pay for a complete degree program.  By purposefully concealing this information from incoming students, Defendants guarantee the failure of their own students.

155.    When the student inevitably learns that he or she will not be able to pay for their remaining coursework with federal financial aid, they invariably withdraw from Defendants' schools without a degree or the prospect of employment in their field of study.  This, in turn,

leaves the student with a mountain of federal student loan debt that he or she cannot repay while the Defendants retain the federal monies.

> ### iii. Defendants Make Numerous Other Material Misrepresentations to Potential Students in Order to Induce them to Enroll in Defendants' Online Schools

156. To continue their participation in the Title IV, HEA federal financial aid program, schools are required to annually prepare and provide to enrolled and potential students the graduation rates for first-time full-time undergraduate students. 34 C.F.R. § 668.45. Schools are also required to disclose graduation and retention rates before a potential student enrolls and enters into any financial obligation. 34 C.F.R. § 668.41(d)(3) & (4).

157. Schools are also required to disclose the "placement of, and types of employment obtained by, graduates of the institution's degree or certificate programs." 34 C.F.R. § 668.41(d)(5). Pursuant to federal regulations, a school commits a misrepresentation if it makes false, erroneous or misleading statements concerning, *inter alia*, "[t]he institution's knowledge about the current or likely future conditions, compensation, or employment opportunities in the industry or occupation for which the students are being prepared." 34 C.F.R. § 668.74.

158. Nevertheless, in an effort to coax hesitant or unwilling students into school, Defendants and their admissions representatives misrepresent graduation and retention rates, employment statistics, and the salaries that students can expect to earn upon completing their program of study. Defendants will distort the schools' graduation and retention rates to appear higher than they actually are, and thus "sell" the school to the student. Likewise, Defendants exaggerate employment statistics and salary information in order to entice prospective students to enroll in a degree program.

159.   Defendants perpetrate these misrepresentations largely through their websites. Prospective students may research Defendants schools through the websites and find consumer information outlining graduation and retention rates, employment statistics and salary information.   Likewise, Defendants' admissions representatives are trained to point potential students towards the schools' websites for a detailed breakdown of these statistics.

160.   AIO, for example, represents on its website that the graduation rate for its degree programs is 45%, meaning that 45% of full-time students who began a bachelor's degree program in Fall 2003 completed that program within six years (i.e. by August 2009).   (AIO Website Graduation Rates, Exhibit 21).   By Defendants' own admission, this figure includes both the Art Institute's ground campuses and AIO courses.   The student is required to scroll to the next page to uncover that AIO's graduation rate is actually 18% for full-time students who began a bachelor's degree program in Fall 2003 and completed that program within six years.

161.   These numbers are not only outdated but also incredibly misleading.

162.   The information provided on the DOE College Navigator website for AIO includes graduation statistics for students who began their bachelor degree program in Fall 2004. (AIO College Navigator, Exhibit 22).   Only 8% of full-time students who began their degree program in Fall 2004 managed to complete the program by 2010.   This is a significant difference from the 18% that AIO advertises on its website.   This more recent information was clearly in Defendants' control as they reported it the DOE.   However, they declined to update their own website with the new statistics for fear of disclosing the precipitous drop in graduation rates from 2009 to 2010 to potential students.

a.   Furthermore, the graduation rates reported on AIO's website and the College Navigator website only include information for full-time AIO students enrolling in college for

the first time.  However, by Defendants' own admission, 93% of its students are enrolled part-time.  Furthermore, many of Defendants' students have previously attended some post-secondary schools and are therefore not included in AIO's calculated graduation rates.  In fact, only 5% of AIO's students qualify as full-time students enrolling in their first college courses.  This means that AIO's reported graduation rates represent only 5% of the students enrolled in its programs.  As such, AIO does not report graduation information for 95% of its student body.

163.    Relators contend that the graduation rates for part-time students and students who have previously taken some post-secondary courses are even lower than the 18% or 8% reported by AIO.

164.    Similarly, AUO represents on its website that the graduation rate for its online school is 47%.  (AUO Website Graduation Rates, Exhibit 23).  However, closer examination of this number reveals AUO's misrepresentations.  AUO does not separate the graduation rates for its online school from the Argosy ground campuses, despite the fact that this number is listed as the graduation rate for the online school.  Moreover, this figure only includes full-time students enrolling in Argosy University schools for the first-time.  Defendants do not include in this calculation the 56% of AUO students who attend online school part-time.  (AUO College Navigator, Exhibit 24).

165.    By providing outdated and skewed information, Defendants misrepresent the true graduation rates at their online schools.  The true, current graduation rate at Defendants' online schools is 1%.  However, this information is never provided to prospective or current students.

166.    Defendants similarly misrepresent retention rates at their online schools by providing potential students with false and outdated information.

47

167.    Again, through its website, AIO represents that the retention rate for its programs is 58%, meaning that 58% of the students who enrolled in AIO courses in Fall 2008 returned for Fall 2009.  (AIO Website Retention Rates, Exhibit 25).  However, this percentage includes both AIO and Art Institute ground campuses.  Nowhere on AIO's website can a prospective student find the retention rate for the online school alone.

168.    AIO declines to disclose its retention rate on its website because the rate is substantially lower than the 58% it can report by combining the retention rates of AIO with the Art Institute ground campuses.

169.    The 2009-2010 retention rate at AIO for full-time students is 18% while the retention rate for part-time students is 28%.  (AIO College Navigator, Exhibit 22).  This means that 18% of full-time students and 28% of part-time students who enrolled in AIO courses in Fall 2009 returned to the school in Fall 2010.

170.    By providing prospective students with outdated information about their retention rates and combining the rates of their online schools with ground campuses, Defendants falsely represent to prospective students that students enrolled in their online schools are receiving a quality educational experience and return each year to work towards completing their degree program.

171.    Furthermore, Defendants' recruiters will tell prospective students to look at the schools' websites for up to date employment and salary information for specific degree programs.  However, these employment statistics are also skewed.  Relators believe that Defendants count students who are working in the same job they had when they first began school as "successfully employed" as a result of completing their degree programs.  Likewise, Relators believe that Defendants count students as gainfully employed if they work in a field

even marginally related to their area of study (i.e. a fashion and retail management graduate working as a salesperson at Footlocker).

172.     These misleading numbers give potential students the impression that large numbers of students successfully graduate Defendants' online schools, find employment in their field of study and receive significant compensation in these positions.  In turn, this conveys to the student that Defendants' online schools will provide them with a proper education and help them to succeed once they graduate.  However, as outlined herein, this simply is not the case.

173.     AIO also fails to tell enrolling students about its mandatory "transition" course, which is expensive yet offers minimal educational value.  Initially, the mandatory course was entitled "Strategies for Success" and cost approximately $1500.  It was the equivalent of a one credit course, although no credit was given toward completion of a degree.  Now the course is entitled "Intro to Visual Arts," and costs even more money (a 4 credit general education course). This course offers no computer training and involves completion of only rudimentary computer tasks, such as formatting documents.

E.     **DEFENDANTS SUBMIT FRAUDULENT FINANCIAL AID APPLICATIONS TO THE FEDERAL GOVERNMENT IN ORDER TO MAXIMIZE THE GUARANTEED MONEY THE SCHOOLS RECEIVE**

174.     Defendants are aware that a vast majority of their students are unable to personally afford the exorbitant cost of tuition at their schools.  As a result, Defendants push incoming students to request substantial financial aid packages from the federal government. Defendants know that if a student receives federal financial aid, the school is guaranteed to receive the funds from the federal government and that the student is more likely to enroll if he or she is not required to make large monthly tuition payments out of their own pocket.

175.    In order to maximize the amount of guaranteed federal funds that are funneled into their schools, Defendants' admissions and financial aid representatives artificially deflate the assets of potential students; thereby increasing the amount of federal financial aid that student receives.

176.    As a prerequisite to the receipt of federal financial aid funds, a student must submit a Free Application for Federal Student Aid ("FAFSA").  The FAFSA uses a student's financial information to determine the amount of money a student and his or her family can afford to pay towards the student's tuition.  This amount, known as the Expected Family Contribution ("EFC"), is calculated by looking at a student's income, marital status, the student's assets, and the student's parents' assets, among other things.

177.    At EDMC, it was critical that every applicant complete the FAFSA form, even those individuals who were not interested in securing HEA funding such as those with GI Bill eligibility or other complete funding.  In filling out the FAFSA, Admissions Representatives instructed students to immediately complete the FAFSA, to answer the questions to the best of their availability, and that they could adjust it at a later date if necessary.  At EDMC, the FAFSA application was critical to actually enrolling students.  If an applicant filled out the FAFSA within 72 hours, there was about a 70% enrollment success rate.  If the applicant did not fill it out within 72 hours, the enrollment success rate dropped to about 15%.

178.    The maximum EFC score varies pursuant to DOE regulations.  However, a student with an EFC of 0 is not expected to contribute any money towards their education and qualifies for the maximum amount of federal financial aid available.  Put simply, the lower a student's EFC, the larger the student's financial aid package.

179.    A student with an EFC of 0 will qualify for the maximum amount of federal Stafford loans (up to $57,000 towards an undergraduate degree) and the PELL grant (up to $5,550 per year for up to four years).

180.    Defendants' therefore push their admissions representatives to make sure as many students as possible receive an EFC of 0.  Defendants know that if a student does not receive the PELL grant, there is less than a 50% chance that the student will matriculate.

181.    After a student applies to school, Defendants tell their recruiters to remain on the phone with students and walk them through the FAFSA.  Defendants train their admissions representatives in a number of techniques to deflate the assets of students and ensure that they receive an artificially low EFC score, thereby maximizing their financial aid packages.

182.    Sherri Sheffield trained a group of admissions representatives, including Relators Carter and Hiser, to remain on the phone with prospective students and fill out the FAFSA for that student.  Sheffield also told Relator Carter, when he first began working for AIO, to put zero for the student's assets on the FAFSA.  Likewise, Relator Laukaitis states that he was told by Will Chippich, an AIO director, that the students' assets and income did not matter and not to worry about them.

183.    Again, skilled admissions representatives can cold call a student and have him or her complete an enrollment application and FAFSA in fifteen minutes.  The prospective student is caught off guard by the unprompted phone call and frequently does not have the financial information required to complete the FAFSA on hand.  This provides Defendants with the perfect opportunity to manipulate students' EFC scores.

184.    As the student works through the FAFSA, he or she is required to list information such as their spouse's adjusted gross income in the previous year, the total balance of their cash,

savings and checking accounts, and their net worth. Students consistently do not know this information off-hand or ask the admissions representatives for help in answering specific questions. In turn, Defendants' employees steer the students towards answers that will result in the lowest possible EFC score. If a student asks whether a specific investment or bank account need be reported, the admissions representative responds, "If it's zero, then put zero." Invariably, the student declines to report the asset or income and instead puts "zero" in the appropriate field, increasing the amount of federal financial aid monies they qualify for.

185.    Relator Laukaitis states that this practice was pervasive at Defendants' online schools, and he remembers directing a student, identified herein as "O.R.," to deflate his assets on the FAFSA. Laukaitis states that the purpose of this was to ensure that O.R. had an EFC of zero and would therefore qualify for federal loans and grant money.

186.    Defendants' employees are not above simply telling students to omit relevant financial information from their FAFSAs. Admissions and financial aid representatives will instruct applicants to exclude bank account information or a spouse's salary from their financial aid application.

187.    One AIO student had completed an enrollment application and FAFSA with an admissions representative and was then transferred to Relator Hiser to discuss her financial aid package. In filling out the FAFSA, the student had correctly reported that her husband made $100,000. When Relator Hiser indicated this amount was counted in the formula used to determine the student's EFC, the student became very upset and asked to be transferred back to the admissions representative. After several minutes, the student was transferred back to Relator Hiser and her FAFSA no longer included her husband's $100,000 salary. The removal of the $100,000 lowered the student's EFC so that she was able to receive the PELL grant and

subsidized loans, which she would not have previously qualified for when her husband's salary was included in the calculation.

188.    When Relator Hiser questioned the change, the student simply said "we're separated" and asked if she could receive the PELL grant now.  Relator Hiser believed the student to be lying about her marital status because the woman had not mentioned that she and her husband were separated during their previous conversation.  Relator Hiser believed that the admissions representative told the student that if she modified her FAFSA to exclude the $100,000 salary, she would receive more federal monies.

189.    Furthermore, James Ferrance had previously told Relator Hiser while she worked in financial aid that she should not "nitpick" student's FAFSAs and financial information unless it was flagged for review by the DOE.

190.    The FAFSA also requires students to indicate whether they filed a tax return for the previous year, which in turn allows the government to verify the financial information contained in the rest of the form.  However, many students do not have their recent tax returns on hand when they are pushed through the admissions and financial aid processes.  Admissions representatives will therefore direct the student to indicate that they are not required to file a tax return.  Recruiters suggest to the student that they "might not be required to file" and push them through the rest of the FAFSA.

191.    Where a student protests that they are, in fact, required to file a tax return or did file in the previous year, the admissions representative will say, "we can go ahead and put 'not going to file' for now and then come back to it later."  This allows the admissions representatives to manipulate the financial information reported on the FAFSA without regard to the accurate

information contained in the student's tax returns. In turn, the information is never corrected at a later date and the student receives an artificially large financial aid package.

192.   Moreover, many students are not even near a computer when they are contacted by Defendants' recruiters and in an effort to ensure the student enrolls in school, admissions representatives will complete the FAFSA for the student over the phone. This   provides   an additional opportunity for the Defendants to deflate the assets of potential students and maximize the size of their federal financial aid packages.

193.   Relator Hiser has personally witnessed admissions representatives forge student financial aid documentation. The scope of this activity ranges from filling out FAFSAs for the students and simply telling the student to sign on the indicated line or in other instances, completing the document entirely on their own and then forging the student's signature. This conduct was rampant and directed by Defendants' senior management.

194.   Likewise, Relator Carter states that Keith Perry, his supervisor, and Sherri Sheffield, an AIO director, told him that if he needed to sign a student's signature to financial aid documentation in order to get them enrolled in school and qualified for an aid package that he should do it.

195.   Relators also remember Keith Perry telling members of his admissions team to talk to Steve Burns, another AIO recruiter, when they needed financial documents forged. Burns became an "expert" in using computer software to copy a student's signature from one document and inserting it into financial aid documentation.

196.   For a number of years, Defendants' employees requested that potential students sign their federal financial aid documentation electronically using the application Microsoft Paint. This allowed students to sign documents that they did not personally fill out and also

rendered it virtually impossible to identify when an admissions representative signed an application instead of the student.

197.    Moreover, if a student is still a dependent, they must include information about their parents' assets on the FAFSA. This information impacts the student's EFC, and thus the size of their federal financial aid package. The larger the student's parents' assets, the higher the EFC and the smaller the federal financial aid package. As such, Defendants' admissions representatives do everything they can to deem a student "independent" and avoid reporting the parents' assets.

198.    A student qualifies as independent if they are over the age of 24, emancipated, in the military, or responsible for supporting their own child. Although many of Defendants' students are legitimately independent as a result of their age, the dependent students are still required to report their parents' assets on the FAFSA. Nevertheless, Defendants' admissions representatives routinely decline to inquire into a students' parents' assets and complete the FAFSA without any mention of the need to report such information.

199.    Relator Hiser recalls an admissions representative named Steve Burns who had a student who enrolled in AIO but was unable to attend class because her FAFSA was not complete. The student was still a dependent, and as such, her FAFSA should have included information about her parents' financial information. Wanting to ensure that the student started class and received her financial aid package, Steve Burns forged the student's father's signature on the documents by copying the signature from another document previously signed by the father and pasting it into the financial document.

200.   Upon completion of the FAFSA, Defendants' admissions representatives immediately transfer the student to a financial aid counselor who is responsible for explaining the total financial aid award and the disbursement process to the student.

201.   The total amount of a student's federal aid package, and information pertaining to his or her obligation to repay federal loans, is contained in an electronic statement forwarded to the student.   The statement is password protected and requires the financial aid counselor to provide the student with a code to unlock the information contained therein.   However, Defendants' financial aid representatives frequently decline to forward the code to the student. As such, it is common for a student to begin classes without ever seeing their full loan package or repayment obligation in writing.

202.   Moreover, if the student cannot see the completed FAFSA or financial aid package, he or she cannot verify the veracity of the information contained therein, giving Defendants carte blanche to submit fraudulent financial aid requests to the federal government. Preventing the student from seeing the extent of their financial aid package also allows Defendants to conceal the fact that this amount will not be sufficient to cover the entire cost of tuition.

       **i.**    **Defendants Exploit the FAFSA Verification Process in an Effort to Conceal the Fact that They Submit Fraudulent Financial Information to the Federal Government**

203.   Ideally, the DOE's FAFSA verification process identifies and corrects much of the fraudulent financial information contained in students' federal financial aid packages.   In reality, however, the verification process provides Defendants with the opportunity to perpetuate this fraud.

204.    The verification process occurs after the student completes the FAFSA and submits it to the federal government. The DOE randomly selects one out of every three students for verification and the school is required to work with the student to verify the information submitted in their FAFSA. However, just as in the initial FAFSA process, Defendants utilize the techniques outlined above to deflate student assets, increase the size of financial aid packages and conceal this scheme from the federal government.

205.    If a student's FAFSA is flagged for verification, the student is notified and provided with a correction form so that they may remedy any issues with their initial FAFSA. However, it is entirely up to the student to complete this form and Defendants' admissions representatives and financial aid counselors routinely guide the student through the process.

206.    Like the original FAFSA, many of Defendants' admissions representatives are not above simply completing the correction forms on their own and forging the students' signatures to the document. Likewise, some representatives keep correction forms on file in which they have circled the "correct" responses and the student simply has to follow the counselor's instructions to complete the correction form, thereby ensuring that the student receives the lowest EFC score possible and that the government is kept in the dark about Defendants' fraudulent aid applications.

207.    At times during the verification process, Defendants' financial aid counselors will discover that a student has failed to report income or other relevant information on their tax returns from the preceding year. Inevitably, this means the student has underreported their income on the FAFSA and has qualified for an inflated federal aid package. Although many financial aid counselors tell the student that they should amend their tax returns and file a 1040x form to properly report their income, it is ultimately up to the student to complete this process.

Counselors will routinely tell students that Defendants "are not the IRS" and that they will not forward the amended return to the IRS. In turn, the student never corrects their tax return or provides the updated information to the IRS.

208.    Moreover, Defendants are not above simply lying to the federal government about the type of course work a student is taking in order to maximize the amount of federal money funneled into the schools. Relators Carter and Hiser worked with a new student, identified herein as "M.M.," who was attempting to transfer from South University Online to AIO. Upon receipt of M.M.'s financial information, Carter and Hiser realized that the student received graduate level loans while attending SUO without ever having completed an undergraduate degree. This discrepancy allowed M.M. to request federal financial aid for her undergraduate degree in an amount above and beyond the typical maximum aid package.

209.    Upon uncovering this information, Relator Hiser brought it to the attention of her supervisor who blamed it on a "glitch" in the system. Later, Hiser spoke with John Bokin who had reviewed similar issues at South University Online. Bokin simply laughed the issue off and told her that is was "South's problem" not theirs.

### F.     DEFENDANTS MAKE IT INCREDIBLY DIFFICULT FOR STUDENTS TO WITHDRAW FROM THEIR SCHOOLS AND FREQUENTLY RETAIN FEDERAL FUNDS FOR FEES AND CHARGES THAT WERE NOT EXPLAINED TO THE STUDENTS AT THEIR TIME OF ENROLLMENT

210.    After being inundated with telephone calls from recruiters and herded through the application and financial aid processes like cattle, many students immediately regret their decision to enroll in Defendants' schools and incur large sums of federal debt. Unsure how, or even if, they can withdraw from school, the student will attempt to contact the admissions representative or financial aid counselor who pushed them through the application processes.

However, Defendants' employees will actively ignore calls from newly enrolled students seeking to withdraw until at least one week of class has elapsed.

211.    This tactic serves two important purposes. First, it guarantees that the student has "confirmed" and counts towards the admissions representative's enrollment goals for the period, thereby increasing his or her compensation on the matrix. Second, it ensures that the student is responsible for at least a portion of the tuition for that semester. Defendants know that a student is less likely to withdraw from school if they are told that they are personally responsible for any outstanding balance. As such, Defendants' admissions and financial aid representatives use the unpaid balance as leverage to keep the student enrolled until the student's financial aid funds are transferred from the federal government to the schools.

212.    For example, one quarter at AIO typically consists of two consecutive five and a half week courses. A student has only one week of class (five days) in which to withdraw from school before they become personally liable for tuition and fees. If a student withdraws from school after the first week of class, they are liable for 25% of the cost of the of the first five and a half week course. If they withdraw after the second week they are liable for 50% and after the third week they become liable for 75%. If a student withdraws after the fourth week, they are responsible for 100% of the cost of the course.

213.    However, a student receiving aid for the first time does not receive any portion of their federal financial aid funds until approximately thirty days after they begin attending classes. Even then, the student only qualifies for 50% of the aid package for the semester and must complete the full semester to qualify for 100% of the federal funds. This means that if a student withdraws from school before thirty days, they do not qualify for any financial aid and are therefore personally liable for any tuition or fees incurred up to that point in time.

214.    As outlined above, schools participating in the Title IV, HEA financial aid program must inform enrolled and potential students about the true cost of attendance and the procedures for withdrawing from the school. 34 C.F.R. § 668.43(1) & (3).

215.    Nevertheless, Defendants' admissions representatives are notoriously tight-lipped about the period of time in which a student can withdraw from school without incurring any financial obligation.  This, combined with the recruiters' attempts to avoid calls from students who are actively trying to withdraw, virtually guarantees that students incur some personal financial obligation for the cost of the course.

216.    When the student is finally able to reach the admissions representative or financial aid counselor sometime after the first week of class, he or she is informed that they are liable for a percentage of the cost of the course and any attendant fees.  The student invariably asks whether their financial aid will cover this balance and they are informed, frequently for the first time, that they do not qualify for any financial aid until they complete the first five and a half week course.

217.    The admissions and financial aid counselors therefore inform the student that if they simply remain in class for a few additional weeks, they will receive a portion of their federal aid package, which they can then use to satisfy the outstanding balance.  Unable to afford even a portion of the cost of this first course out of pocket, the student inevitably agrees to remain in school until they are eligible to receive at least 50% of their federal financial aid.  Ultimately, the student withdraws from school after they receive enough federal funds to cover the outstanding balance.

218.    This scheme guarantees that Defendants receive at least a portion of the inflated financial aid packages while the student becomes obligated to the federal government to repay

these funds.  However, the student, having completed only a single class, lacks the degree and skills required to obtain a job in their field and is unable to fulfill their repayment obligation.

219.    Defendants will also contact prior students who have managed to withdraw from school and use any outstanding balances as leverage to convince the student to return. Defendants will identify students with past due balances and warn them that they will be turned over to collections unless they pay the charges immediately.  Again, many of these students withdrew without completing a degree program and are not in a position to pay these substantial fees out of pocket.  Defendants' admissions and financial aid representatives then suggest that, rather than sending the bill to collections, the student re-enroll in school and request new financial aid.  Defendants then use these new funds to satisfy the prior outstanding balance, further exhausting the student's financial aid eligibility and ensuring that they will be unable to afford the total cost of their degree program.

220.    In fact, until Summer 2010, AIO had an entire "re-admissions department" devoted to convincing withdrawn students with outstanding balances to return to school and use new financial aid to satisfy unpaid bills.

221.    In January 2011, Relator Laukaitis's student who used a stipend to pay for a new transmission in his car, identified above as P.A., started classes with AIO before being officially accepted to the school.  P.A. completed one course and received a portion of his financial aid package, including a stipend of approximately $2,000.  However, after completing the course, the student was denied admission to AIO because his high school GPA was too low and he was forced to withdraw.  Finding that the student had already used the stipend for other expenses (i.e. to fix his car), the school reimbursed the federal government for the $2,000 stipend.

222.    After learning that P.A. had been denied admission at AIO, Laukaitis told the student to appeal the rejection.  The student did just this and ultimately was re-accepted to AIO. With the help of an AIO financial aid representative, P.A. then requested and received a new financial aid package that included an additional $2000, above and beyond what was needed to pay for his future courses.  Defendants then unilaterally used this money to reimburse themselves for the stipend it had prematurely released to P.A. during his initial enrollment.

223.    Relators contend that this sort of misappropriation of federal money is rampant in Defendants' organization.  In fact, P.A. was only one of a number of students identified on a list of individuals who had withdrawn from AIO and had an outstanding balance of unpaid tuition or fees at the school.   In January 2011, an AIO director of admissions named Jackie Boring circulated this list of students to recruiters and financial aid reps.  Boring told the employees that they should go after these students and use their outstanding balances as leverage to re-enroll the students in school and submit new financial aid requests to reimburse the school for these prior unpaid charges.

224.    Furthermore, where a student attempts to withdraw before they have started class, Defendants' admissions managers will tell the student that they may be liable for fees on their student account, and that the only way to avoid being personally liable for these charges is to matriculate and wait until their financial aid package comes in.  Despite these statements, Defendants' admissions representatives know that the student cannot be held responsible for any fees if they have not yet attended a class.

225.    Relators Laukaitis and Carter state that Keith Perry will personally handle any calls from their students attempting to withdraw from AIO before classes begin.  Despite knowing that he cannot charge a student for a course that they did not actually attend, Perry tells

the student that they may be held responsible for an outstanding fee and invariably the student agrees to attend class and remain enrolled at least until he or she receives their financial aid funds.

226.    Defendants' recruiters will also convince withdrawn or existing students to reenroll in a course that they may have failed and then use new federal financial aid to pay for that course again.

### G.    DEFENDANTS' ONLINE SCHOOLS RECEIVE MORE THAN 90% OF THEIR REVENUE FROM FEDERAL FINANCIAL AID SOURCES AND THE SCHOOLS ATTEMPT TO CONCEAL THIS FACT THROUGH A NUMBER OF FRAUDULENT SCHEMES

227.    Defendants' schemes ensure that massive amounts of fraudulently obtained federal funds are funneled into their online schools each year.

228.    Concealing this fraud creates unique challenges for the Defendants, particularly in light of federal regulations requiring that each proprietary institution derive no more than 90% of its revenue from the receipt of federal financial aid funds.  34 CFR § 668.28(a)(1).  This is known as the "90/10 rule," because at least 10% of the schools revenue must come from some source other than federal financial aid funds.

229.    Compliance with this requirement is calculated by the following formula: Federal financial aid funds the institution used to satisfy the students' tuition, fees, and other institutional charges to students, divided by the sum of total revenues generated by the school from (1) tuition, fees, and other institutional charges for students enrolled in eligible training programs, plus (2) school activities (to the extent not included in tuition, fees, and other institutional charges) necessary for the education or training of the students enrolled in those eligible programs.  34 CFR § 668.28(a)(1); 34 CFR § 668, Subpt. B, App.C.  The resulting figure should be 90 percent or less.  34 CFR § 668.28(a)(1).

230.    If a proprietary college fails to satisfy the 90/10 rule, it must notify the Office of Financial Aid at the DOE within 45 days after the end of its fiscal year.  34 CFR § 668.28(c)(3).

231.    The 90/10 rule was previously considered an institutional eligibility requirement under the PPA, and failure to comply with the rule resulted in the loss of eligibility to participate in the federal financial aid programs during the fiscal year immediately following the year it failed to comply with the 90/10 rule.  However, in 2008, the penalty for failing to meet the 90/10 rule was revised so that a non-compliant institution's eligibility to participate in federal financial aid programs becomes provisional for the next two years.

232.    In an effort to avoid violating the 90/10 rule, Defendants aggressively pursue students who receive forms of tuition assistance that do not count towards the 90% federal aid cap.  Defendants are aware that it is rare to find students who can contribute large amounts of personal money towards their education, and as such, they target potential students who work at companies that pay for their employees' education.

233.    Moreover, VA educational assistance does not count towards the 90% cap.  As a result, Defendants established an entire task force designed to pursue United States military personnel in order to continue to profit from federal money that also offsets the 90/10 calculation.  This task force was headed by Jaime Yaghoubi, the wife of OHE's former Senior Director of Admissions, Sam Yaghoubi.  Defendants viewed armed services members as "easy targets" because they did not have many of the same financial concerns as other prospective students since they are already pre-qualified for significant amounts of guaranteed federal monies that did not need to be paid back to the government.

234.    Caldwell told Boring and her other Directors that "they" needed to get down to the 90/10 ratio or that they would be "shut down."

235.   In response to EDMC Management's realization that AIO was not meeting its 90/10 ratio, Boring was directed to train, and did in fact train, his subordinates to solicit enrolling students to make cash tuition payments, including to ask students to agree to an automated debit system whereby tuition payments would be drawn from their bank accounts.  The sole impetus for this initiative was to increase the amount of non-federal funding of tuition payments and to try and comply with the 90/10 Rule, and not to assist the students.   While Admissions Representatives solicited cash payments from enrolling students as directed by EDMC management, they nevertheless encouraged enrolling students also to seek out the maximum amount of federal funding which resulted in them taking on more student federal loan debt than was necessary.

236.   Relators Carter and Laukaitis were instructed to target military personnel.  When the potential student would express concern that he may be deployed to Afghanistan or Iraq in the immediate future, the Relators simply told the student that they could continue their online studies overseas while on active duty.  Invariably the student would enroll, the Defendants received large amounts of guaranteed federal monies, and the student would discontinue their studies upon being deployed overseas.

237.   Defendants' military initiative has been a tremendous financial "success," as they have increased the amount of GI Bill money the schools receive from $2.04 million in 2009 to $52.4 million in 2010.  In fact, EDMC as a whole collected $173 million in GI Bill education benefits from 2009 to 2011, with a majority of that being funneled into Defendants' online schools.  Approximately 4% of EDMC's revenue is derived from military-related financial aid programs and more than 8% of EDMC's students are military personnel or veterans.  (EDMC Q3

FY12 Earnings Call Document, Exhibit 26).  30% of these military students are enrolled in Defendants' online schools.

238.    In fact, if GI Bill money was included in federal aid revenues under 90/10, Defendants' online schools would all currently be in further violation of the rule.  If military money counted toward the 90%, AUO would be at 94.19%, AIO would be at 92.3% and SUO would be at 92.58%.  (EDMC Military Funds Projection, Exhibit 27).

239.    Defendants have also instituted initiatives to manipulate the 90/10 calculations at their online schools.  For example, AUO has begun providing qualifying students with a "Student Success Grant."  Under the program, AUO rewards students who pay for even a nominal portion of their education in cash by reducing their tuition.  The program entices students to personally pay for a portion of their tuition, which counts towards the school's revenue from sources other than federal funds.  However, when AUO discounts the student's tuition, the school is able to further skew the 90/10 calculation in its favor.  By reducing the cost of the student's tuition and in turn the amount of federal financial aid funds the student needs to pay for his or her degree, AUO can increase the weight that even a nominal cash payment has in the 90/10 calculation.

240.    In addition, EDMC Management began offering "scholarships" in an effort to comply with the 90/10 Rule (and to continue to increase recruitment).  In exchange for completing the first 3 classes, students would receive a $1500 stipend or scholarship.  Upon receipt of the stipend/scholarship, EDMC "counted" that amount as non-federal funding for tuition in its 90/10 calculations.

241.    Despite these efforts, at least two of Defendants' online schools, AUO and SUO, are currently in violation of the 90/10 rule.  Rather than report this information to the DOE,

however, Defendants utilize a number of tactics to conceal this information and ensure that they continue to receive federal financial aid funds.

242.    Although the schools are operated independently of one another, Defendants combine ground and online programs to calculate their 90/10 numbers and report this information to the DOE.  Defendants' ground campuses traditionally operate within the scope of DOE regulations and do not have issues with the 90/10 rule.  However, as a result of the conduct outlined at length above, Defendants' online schools consistently receive more than 90% of their revenue from Title IV, HEA funds.  Combining the ground and online campuses for reporting purposes therefore allows Defendants to conceal the fact that their online schools are in violation of the 90/10 rule.

243.    In fact, in an email exchange dated March 13, 2012, EDMC's Student Consumer Information Specialist, Jim Richardson, confirmed to Relator Hiser that the reason Defendants combine ground and online campuses is to conceal regulatory violations at the online schools. (3/13/12 Jim Richardson Email, Exhibit 28).  Specifically, Jim Richardson stated "That is one reason why we merge schools, to help with default rates, 90/10 ratios, gainful employment."

244.    As part of her duties as a financial analyst in EDMC's Corporate Offices, Relator Hiser had access to raw student financial data, and was therefore able to calculate 90/10 ratios for each of the online schools, before the numbers were combined with ground campuses.  What she found was alarming.

245.    SUO's 90/10 calculations from 2007 through 2012 are as follows:

| South University Online | | |
| --- | --- | --- |
| Fiscal Year | 90/10 Calculation | Title IV Funds Received |
| 2007-2008 | 90.31% | $41,379,972.92 |

| 2008-2009 | 90.39% | $83,223,305.14 |
| 2009-2010 | 94.85% (unsub not as cash)[1] | $148,027,890.35 |
| 2010-2011 | 94.73% (unsub not as cash) | $152,220,216.15 |
| 2011-2012 | 87.66% (incomplete data) | $128,710,765.91 (incomplete data) |

(SUO 90/10 Data, Exhibit 29). As such, SUO has been in violation of the 90/10 Rule since, at least, the end of fiscal year 2007-08.[2]

246. AUO's 90/10 calculations from 2007 through 2012 are as follows:

| Argosy University Online | | |
| --- | --- | --- |
| Fiscal Year | 90/10 Calculation | Title IV Funds Received |
| 2007-2008 | 89.54% | $14,052,132.79 |
| 2008-2009 | 92.01% | $44,528,427.18 |
| 2009-2010 | 92.71% | $91,865,940.93 |
| 2010-2011 | 94.28% | $170,461,579.13 |
| 2011-2012 | 93.12% | $123,916,512.28 |

(AUO 90/10 Data, Exhibit 30). As such, AUO has been in violation of the 90/10 Rule since, at least, the end of fiscal year 2009-10.

247. Further, OHE President John Kline gave a presentation in early 2012, which confirmed that SUO and AUO were in violation of the 90/10 Rule for Fiscal Year 2010-2011. (Kline Presentation, Exhibit 31). Slides shown during the presentation illustrated how SUO's 90/10 calculation for the year was combined with the lower 90/10 numbers for South

---

[1] From July 1, 2008 through July 1, 2011, proprietary institutions were allowed to count certain portions of unsubsidized Title IV loans as cash in their 90/10 calculations. 34 CFR § 668.28(a)(6). Relators in the instant action were unable to find SUO 90/10 calculations including unsubsidized loans as cash for fiscal years 2009-10 and 2010-11. As such, the 90/10 calculations with these portions of unsubsidized loans included as Title IV funds have been provided for those years. Given the relatively small amount of unsubsidized loan funds that can be counted as cash and how far over the 90% cap SUO was for 2009-10 and 2010-11, Relators aver that SUO was still in violation of the 90/10 Rule for those years when the unsubsidized loans are counted as cash.

[2] Prior to August 14, 2008, failure to meet the 90/10 requirement for even one year resulted in disqualification from the Title IV program. Because SUO was at 90.31% for fiscal year 2007-08, they became ineligible to participate in the Title IV federal aid program at the end of that fiscal year and before the change in the 90/10 Rule.

University's ground campuses to give the appearance of compliance.  Likewise, AUO's 90/10 calculation was combined with the lower 90/10 numbers for Argosy University's ground campuses to hide the fact that the online school was in violation.

248.    What is more, Kline reported that as of January 2012, SUO and AUO were receiving so much federal money that they were on pace to violate the 90/10 Rule for Fiscal Year 2011-2012.

249.    To Relators' knowledge, this information was not communicated to the DOE. Rather, Defendants reported the combined 90/10 calculations in order to give the appearance of compliance at their online schools.

250.    All told, AUO and SUO, alone, have obtained over $800,000,000.00 in federal financial aid funds since violating the 90/10 Rule.

251.    AIO's 90/10 calculations from 2007 through 2012 are as follows:

| Art Institute Online | | |
|---|---|---|
| Fiscal Year | 90/10 Calculation | Title IV Funds Received |
| 2007-2008 | 79.29% | $62,058,603.78 |
| 2008-2009 | 82.08%<br>(unsub not as cash: 86.95%) | $104,058137.58 |
| 2009-2010 | 86.90%<br>(unsub not as cash: 91.26%) | $146,765,557.64 |
| 2010-2011 | 86.28%<br>(unsub not as cash: 90.35%) | $160,748,647.24 |
| 2011-2012 | 83.54% (incomplete data) | $148,661,883.95 (incomplete data) |

(AIO 90/10 Data, Exhibit 32).

252.    Although it appears that AIO did not violate the 90/10 Rule from 2007 through 2012, Relator Hiser learned from coworkers in the EDMC corporate offices that AIO may

violate the 90/10 Rule in Fiscal Year 2012-2013. In an effort to conceal this violation, Defendants are considering merging AIO with an Art Institute ground campus in California to help balance the online school's 90/10 calculation.

253. In fact, Defendants admitted in a recent financial filing that, based on projections, many of its schools may violate the 90/10 Rule for Fiscal Year 2012-2013. (5/9/12 EDMC 10-Q SEC Filing, Exhibit 33).

254. In an effort to further manipulate their 90/10 calculations, Defendants combine entirely unrelated schools. Relators state that Defendants will take ground locations or online programs from one university that is in violation of 90/10 and then register it as a branch campus of another, wholly unrelated university that is well below 90%. Defendants then report these combined calculations to the DOE to hide the fact that many of their schools routinely violate the 90/10 rule.

255. For example, Brown Mackie College received 90.8% of its revenue from federal financial aid funds in 2011, with some locations receiving as much as 98.1% of their revenue from these sources. (Kline Presentation, Exhibit 31). However, in calculating and reporting the 90/10 ratio, Defendants combined the Brown Mackie campuses with the Art Institute of Phoenix. This combined calculation allowed Defendants to report that the schools only received 88.0% of their revenue from Title IV funds, thus giving the illusion of compliance at Brown Mackie.

256. Similarly, the Art Institutes of Dallas and Fort Worth are inexplicably included in the 90/10 calculations for South University's ground campuses. (Kline Presentation, Exhibit 31). This allows Defendants to report that the schools received only 82.1% of their 2011 revenue from financial aid monies.

257.    Even with these manipulations, Defendants are not above simply lying about the 90/10 rates at their schools.  According to Kline's presentation, South University, including ground and online schools, received 87.6% of its 2011 revenue from federal financial aid funds.  However, an earnings call report prepared in April 2012 lists this number as 84.4%.  (EDMC Q3 FY12 Earnings Call Document, Exhibit 26).  Likewise, the Kline presentation illustrates that Argosy University, including ground and online schools, received 88.9% of its 2011 revenue from Title IV funds, but EDMC lists this number as 88.1% in the earnings call report.  These lies allow Defendants to give the appearance that their schools are well below the 90% cap even though this is simply not the case.

### H.    DEFENDANTS ERRONEOUS, DECEPTIVE AND MISLEADING SALES TECHNIQUES DISQUALIFY THE SCHOOLS FROM RECEIVING VETERANS AFFAIRS EDUCATIONAL AID

258.    Schools that wish to participate in the education assistance programs administered by the Department of Veterans Affairs ("VA") may not engage in erroneous, deceptive, or misleading conduct.  Specifically:

> (1) If an educational institution uses advertising, sales, enrollment practices, or candidate handbooks that are erroneous, deceptive, or misleading by actual statement, omission, or intimation, VA will not approve:
>
> > (i) An enrollment in any course such an educational institution offers; and
> >
> > (ii) Payment of education assistance as reimbursement to a veteran or eligible person for taking a licensing or certification test that the educational institution offers.

38 C.F.R. § 21.4252(h).  The regulations governing the Montgomery GI Bill and the Post-9/11 GI Bill further reiterate the ban on erroneous, deceptive, or misleading statements, omission, or

intimations.  38 C.F.R. §§ 21.7122(c); 21.9765.  The VA regulations are significantly broader than the corresponding regulations governing misstatements and deception under Title IV.

259.    Despite the VA requirements, Defendants' admission representatives and financial aid counselors aggressively target military personnel and veterans through the promulgation of false and misleading information.  Defendants purposefully decline to inform prospective and enrolled military students about the true cost of attendance at their online schools and refuse to explain nebulous fees that appear on students' tuition bills.  Defendants' admissions representatives also misrepresent graduation rates at the online schools and job prospects for graduates.  Further, Defendants falsely promise prospective military students that a degree from one of their online schools will guarantee an increase in rank and pay upon graduation.

260.    Each of these erroneous, deceptive, or misleading statements, omissions, or intimations are made with the sole purpose of funneling guaranteed VA money into Defendants' online schools and balancing out the schools' 90/10 calculations.

261.    Beginning on July 27, 2006 and through March 2012, Relator Richie served as an employee of Education Management Corporation.

262.    From July 2006 through June 2011, Richie served as an Admissions Representative with the Art Institute Online.

263.    In July 2011, he became an Admissions Representative with Argosy University Online.

264.    As an Admissions Representative, Richie was responsible for contacting potential students and guiding them through the application process.

265.   Richie also recruited and worked with potential students with ties to the U.S. Military.

266.   Richie also worked closely with students to complete the FAFSA.

267.   There are several types of VA educational benefits available to military personnel such as the Montgomery GI Bill ("MGIB"), the Post 9/11 GI Bill, and the VA Reserve Education Assistance Program ("REAP") (collectively "GI Bill educational benefits").

268.   The MGIB provides up to 36 months (4 regular school years) of education benefits to eligible veterans for, *inter alia*, college.  It is available to Active Duty members who have served at least two years on active duty and certain Veterans based on dates enlisted and length of active duty service.   The benefits include up to $1473 per month for full-time institutional education and can be worth more than $53,000.00.

269.   The Post 9/11 GI Bill provides up to 36 months (4 regular school years) of education benefits to eligible service members and veterans for, *inter alia*, college.  It is available to service members (Active Duty, Guard and Reserve) and Veterans who have served at least 90 days on active duty since 9/10/2001.  The education benefits include paid tuition and fees, living (housing) stipend and a book stipend.  Benefits are tiered based on number of days on active duty.  Benefits can be transferred to Spouse or Family member.  The benefits are paid directly to the school.

270.   REAP is a Department of Defense/VA education benefit program designed to provide educational assistance to members of the Reserve components called or ordered to active duty in response to a war or national emergency.  The education benefits may be over $1100 a month for those enrolled full-time and can be worth more than $40,000.00.  Benefits are tiered based on number of days on active duty.

271.    Although not initially a priority when Richie and Lardo began employment in 2006, shortly thereafter Defendants began focusing on and targeting prospective students with ties to the military.  This was based in part on analyses indicating that these prospective students were the least knowledgeable of the bad publicity then surrounding for-profit colleges and universities, and also that they were lacking sophistication in the financial aid process.  It further was based on the application of the "90/10 Rule," in that funds derived from GI Bill educational benefits were considered "other means" and were not counted as Title IV HEA funds.

272.    Later in 2011, Defendants created a separate department tasked with handling military recruitment.  EDMC also changed its admission interview process to include questions whether the prospective students or their families were in the military.  If the response was affirmative, the lead was to be transferred to the military recruiters for further handling.

273.    Defendants' admissions representatives made numerous misrepresentations regarding GI Bill educational benefits.

274.    For example, Defendants' admissions representatives unnecessarily encouraged prospective students who were eligible for GI Bill educational benefits to also take out federal student loans.  They told these prospective students that a student loan was necessary because the GI Bill education benefit application process would take much longer than the student loan application process, and they would need the extra student loan money for additional expenses including for the initial tuition payment.  This was false.  The student loan application process and the GI Bill benefit process took roughly the same amount of time, and there was no need to receive a student loan as the Defendants could and often did waive the initial tuition payment for individuals entitled to GI Bill education benefits.

275.    Defendants' admissions representatives also misled the prospective students to believe that the VA/Military would repay these student loans.  This was false.  The VA/Military would not repay these student loans.

276.    Defendants' admissions representatives also encouraged the prospective students to apply for the maximum student loan amount, telling them that it would result in more money in their pocket.  This extra money in turn, as assured by Defendants' admissions representatives, could be used to make car payments or a down payment on a house, pay rent, purchase a computer, and/or to pay past bills.  It was also suggested that the money could be used to purchase rental property or a small business, which then could result in extra income for the student.

277.    Defendants also sent students links to suppliers through its "Journey Ed" program. Students then could purchase items not directly covered by the GI Bill educational benefits such as a new computer or program software.

278.    Thus, Defendants encouraged the prospective students to seek and receive student loans for non-educational purposes in violation of federal procedures.

279.    Defendants knew or should have known that students receiving both GI Bill educational benefits and federal student loans are using portions of those funds for inappropriate non-educational purposes.

280.    Defendants' admissions representatives coached prospective students on the FAFSA process in order to maximize the amount of student loan which was need-based.  While the admissions representatives were not permitted to fill out the FAFSA form, they were trained to offer direction to the student to maximize the student loan amount.  For example, telling the student, "If I were the one filling out the form, I would do it this way, etc.," often times

minimizing or eliminating any "expected family contribution." Defendants have an obligation to work in the best interests of the government as well as the student, and Defendants failed to meet this obligation including by failing to inform the DOE of the students' VA funding stream and by encouraging military students to apply for and receive unnecessary Title IV, HEA student funding.

281.    By encouraging these students to apply for both student loans and their GI Bill educational benefits, Defendants assured themselves of two separate government revenue streams to apply toward their exorbitant tuition costs and fees.

282.    In the event Defendants received money from the VA to pay for a student's tuition and the tuition already had been paid via a student loan, Defendants would not return the money to the VA.  Instead, Defendants would pass along this money to the student without informing the student that he or she remained responsible for the entire student loan amount.

283.    Neither the DOE nor the VA were aware that they both were sending money to Defendants to cover the same exact costs of tuition and fees.  Nor is the VA aware that portions of its direct payments to the Defendants are redirected to the student.

284.    Defendants' admissions representatives made other fraudulent statements.

285.    For example, Defendants' admissions representatives told prospective students with military ties that there was a 10% discount if they or a family member were in the military. This was misleading as the prospective student was not informed that the family member had to be in active duty.  Students without a family member in active duty would not be aware that they had not received the discount until a later date after they had enrolled and received a bill.  Only if they complained to Defendants would they inform the students that a family member had to be in active duty in order for them to receive the discount.

286. Also, Defendants' admissions representatives also misled prospective students with military ties by failing to inform them that the 10% discount did not apply to those individuals serving in the National Guard.

287. Defendants' admissions representatives also informed prospective students that they would be working with a "Military Specialist" who could "best educate" them and "guide them through the process." This was false. The admissions representative simply would pass the phone to a fellow recruiter who would falsely pass himself off as a "Military Specialist."

288. Defendants' admissions representatives informed prospective students with military ties that they could attend school even if they were deployed. This was false. Soldiers who were deployed did not have the required access to WiFi internet access (whether due to time use restrictions, black-out periods on military bases, etc.) to successfully complete online classes.

289. Prospective students with military ties detrimentally relied on these misrepresentations. They enrolled with Defendants under false pretenses. They took out unnecessary student loans and enrolled with Defendants. However, only after incurring substantial student loan debt and at a later date did they discover that the Military/VA would not repay their student loans and that they alone were responsible for loan repayment. Based on information and belief, a substantial number of these students have defaulted on their student loans.

290. Richie and Lardo have knowledge of Defendants' fraudulent practices relating to the recruitment and enrollment of prospective students intending to enter the Military.

291. For example, Defendants' admissions representatives informed prospective students intending to enter the Military that if they enrolled with Defendants before beginning their military service that they would be eligible to receive a promotion after completing basic

training and, as a result, they would earn more money at the higher rank. This was false. Mere enrollment with Defendants did not make a soldier eligible for a promotion following completion of basic training. To be eligible for such promotion based on post-secondary education, a soldier needed to have already completed a substantial number of college credits (e.g., 36 credits).

292.    Defendants' admissions representatives represented to prospective students that certain celebrities (e.g., George Lucas) had graduated from the Art Institute, when in fact those individuals had never even attended the Art Institute.

293.    Defendants' admissions representatives knowingly placed students into certain programs (e.g., interior design) when they knew and/or had reason to know that those students did not have (and did not have access to) the required program software and therefore would not be able to complete the course.

294.    Defendants' admissions representatives also informed prospective students intending to enter the Military that if they took out a student loan and enrolled with Defendants before beginning their military service that their student loans later would be repaid by the Military/VA (e.g., through the GI Bill). This was false. The Military/VA will not repay student loans incurred by a soldier prior to entering military service.

295.    Prospective students intending to enter the Military detrimentally relied on these misrepresentations. They took out student loans and enrolled with Defendants. However, only after incurring substantial student loan debt and at a later date did they discover that mere enrollment with Defendants did not make them eligible for a promotion following basic training, and that the Military/VA would not repay their student loans and that they alone were responsible for loan repayment. Based on information and belief, a substantial number of these students have defaulted on their student loans.

296.    Relator Dennis's experience at AIO is indicative of the type of fraud and misstatements that Defendants perpetrate on VA and military students.

297.    Dennis initially thought about returning to school to complete her college degree in late 2009. On a generic college information website, not affiliated with any of Defendants' schools, Dennis found an aptitude test that was designed to help prospective college students determine the field of study that was most appropriate for their existing skills and interests. In light of Dennis's background in dance and the fine arts, the test informed her that she should pursue a bachelor's degree in media arts and animation.

298.    However, like the fraudulent job postings outlined above, the aptitude test was merely a way for Defendants' schools to generate leads on prospective students. Within hours of completing the test and receiving her results, Dennis was bombarded with telephone calls from an AIO admissions recruiter.

299.    It should be noted that the aptitude test specifically asked Dennis how she planned to pay for college, and she indicated that she was the recipient of VA educational assistance funds.

300.    Aware that she was a veteran, the AIO recruiter pressured Dennis to enroll in the school. He told Dennis that students at AIO have a "98% success rate," suggesting to her that 98% of the students who enrolled in the school graduated and found jobs in their field of study.

301.    As outlined at length above, Defendants and their recruiters are aware that this is simply not the case. AIO advertises an 18% graduation rate; however, the DOE College Navigator website lists the AIO graduation rate at 8%. (AIO Website Graduation Rates, Exhibit 21; AIO College Navigator, Exhibit 22). Even ignoring the fact that these numbers only account for first time, full time students, they are still significantly below the 98% success rate

emphasized by AIO's admissions representative. The recruiter's statement is even more egregious when one considers that the graduation rate for all students attending EDMC's online schools is approximately 1%.

302.   The AIO recruiter also touted the school's job placement program and the valuable connections that the professors have in the fields in which they teach. Specifically, the recruiter told Dennis that her professors would ensure that she got interviews in her field of study and begin a successful, high paying career once she graduated. Dennis would later learn from other students in her class that this was simply not the case.

303.   Although Dennis asked what the total cost of her degree program would be at AIO, the recruiter declined to provide her with this information. Even after she continued to ask about the total cost, the recruiter informed her that it was difficult to say for certain, since the cost per credit changed from term to term.

304.   Instead, the recruiter convinced Dennis that she should apply for Title IV federal aid funds on top of her guaranteed VA aid. The recruiter explained that these combined amounts would be more than enough to cover her cost of attendance and any associated fees and supplies, and that, in fact, she would receive a substantial stipend that she could use for whatever she wished. The recruiter further stated that Dennis would have no problem paying back her federal student loans once she completed the program and found a high paying job in her field of study.

305.   The recruiter also explained that Dennis could purchase supplies and software for her courses through a voucher program administered by AIO. The recruiter indicated that after receiving the voucher from the school, Dennis could use it to purchase items from the schools' store, at no cost to her. Unbeknownst to Dennis, however, the school would bill her for each of

these vouchers and reimburse itself from her VA and DOE funds.   (Dennis AIO Financial Account Info, Exhibit 34).

306.   After her discussions with the recruiter, Dennis continued to research AIO on the school's website.   There she found information about the various high paying jobs AIO graduates could expect. As outlined above, this information was false and misleading.

307.   As a result of the recruiter's statements and the advertised job statistics, Dennis enrolled in the graphic design bachelor's degree program at AIO and began classes in February 2010.

308.   Dennis attended AIO full time for four academic sessions, before having to withdraw in October 2010 when she moved from Savannah, Georgia to Perry, Georgia and needed to care for her young family.

309.   Dennis briefly attempted to return to AIO in July 2011, before being forced to withdraw while pregnant with twins.

310.   Dennis returned to AIO full time in December 2011 and attended classes for four sessions before taking a short period of time off during the Summer of 2012 and beginning school again in September 2012.

311.   Unbeknownst to Dennis, she had accrued an unpaid balance at AIO in the amount of approximately $500.

312.   Throughout the periods in which she was not actively enrolled in courses at AIO, the school's recruiters and financial aid representatives hounded Dennis with calls about this unpaid balance.  Dennis informed Defendants' employees that she could not afford to pay the $500 balance.  Undeterred, the recruiters and financial aid representatives told Dennis that if she

re-enrolled at AIO, she could request new financial aid funds from VA and DOE to cover this unpaid balance.

313.    An AIO financial aid representative, John Simmons, further promised Dennis that if she returned to the online school, she could receive a stipend of $5,100 per term (i.e. two academic sessions), which she could then use to support her family.  This would again require Dennis to apply for Title IV funds, including the Pell Grant and Federal Direct Loans, above and beyond the amount of VA educational benefits she qualified for as a veteran.  Nevertheless, the recruiter assured Dennis that once she completed her degree she would make more than enough money to repay the federal student loans.

314.    As a result of this pressure, Dennis re-enrolled in AIO in December 2011 after almost a year off from school.

315.    Upon re-enrolling in December 2011, AIO directed Dennis to switch from the Montgomery GI Bill, under which VA released the educational assistance to the veteran, to the Post-9/11 GI Bill, which required VA to directly reimburse the schools for the cost of the veteran's tuition.  This was a common practice amongst Defendants' schools.  The switch had the effect of cutting out the middle man (i.e. the veteran), and ensuring that the schools received the guaranteed military funds directly.  This, in turn, allowed Defendants to charge VA for bogus and unexplained fees and ensure that the schools were paid in full before the student received any monies.

316.    In Dennis's case, this switch ensured that she was not in control of her own educational financial assistance and, therefore, forced to suffer significant difficulty and delay in the receipt of her stipend.

317. Upon re-enrolling in September 2012, AIO informed Dennis that she could expect her stipend within 6-8 weeks. However, after attending classes for over two months, the school still had not released the stipend to Dennis.

318. Despite repeated calls to AIO's admissions and financial aid departments, the school refused to help her.

319. Dennis then contacted VA directly to determine the cause of the delay, only to find out that AIO had not requested any military education aid on her behalf. Dennis then learned that, without her knowledge, AIO had used her Title IV funds to pay for her tuition, effectively precluding her from receiving any extra funds as a stipend.

320. When Dennis brought the error to AIO's attention, the school requested the appropriate amount of Post-9/11 GI Bill money, but continued to refuse to release a stipend to Dennis.

321. Dennis had experienced lengthy delays in the release of her stipend during her previous periods of enrollment as well.

322. Without these extra funds, Dennis was unable to afford the cost of software and supplies necessary for many of her courses. Specifically, Dennis was unable to afford the most current version of the graphic design software required for almost all of her courses, a larger scanner in order to scan her homework assignments, or the charcoal and expensive paper needed for her drawing classes.

323. Unable to afford the necessary materials, and in dire financial straits, Dennis's schoolwork began to suffer. She failed four classes and began to question whether she would be able to complete her degree program.

324.    Throughout her Fall 2012 enrollment, Dennis pleaded with AIO to release her stipend.  However, she received no response.

325.    During this period, Dennis also discovered that she was being charged a "digital resource fee" and "online lab fee" for each course she took at AIO.  (Dennis AIO Financial Account Info, Exhibit 34).  These fees were never explained to her, nor was she ever told by AIO that the school was using her VA and DOE funds to pay for them.

326.    Fed up with AIO's failure to address her concerns, Dennis actually contacted, Jeff Braun, the executive assistant to the President of the Art Institute of Pittsburgh ground campus.  Although the Mr. Braun declined to help Dennis, he did concede that the ground campus received complaints about the online school "all the time."

327.    Unable to get any response from AIO, she began asking her fellow classmates, many of them veterans, if they were having similar problems.  Her classmates indicated that they were also having issues with their stipends.

328.    Once the school learned that Dennis was speaking to her classmates about these issues, she was contacted by the AIO coordinator of student affairs, Robin Shuglie, and threatened with disciplinary action if she did not cease discussing the problems she was encountering.  (11/16/12 Robin Shuglie Email, Exhibit 35).

329.    Unable to ignore Dennis any longer, Adrian Valino, an AIO finance manager, informed Dennis that she could not receive the stipend because VA and DOE regulations prevented the school from requesting funds in excess of the actual cost of tuition.  When Dennis requested documentation supporting this assertion, Valino finally relented and released the full $5,100 stipend to her.

330. Frustrated with the schools' conduct, Dennis withdrew from AIO on December 6, 2012, without a degree.

331. Dennis later learned that AIO charged her for the academic session set to begin on December 6, 2012, even though she was no longer a student at the school. (Dennis AIO Financial Account Info, Exhibit 34).

332. After recently moving to Little Elm, TX, Dennis is in the process of enrolling at Collin College, a public community college nearby. After completing her associate's degree she hopes to finish her bachelor's program at Texas Women's University, a public four-year college.

333. However, in applying to Collin College, Dennis has learned, for the first time, that many of her AIO course credits may not transfer to the school.

## I.   DEFENDANTS ARE AWARE OF THEIR FRAUDULENT CONDUCT

334. Defendants have made it clear that maximizing the number of students and the size of those students' aid packages are the ultimate goals for the online schools. Those who have participated in this fraud, and thereby "excelled" in the Defendants' eyes, have routinely been promoted to higher positions within the Defendant companies. Upon attaining managerial and supervisory roles, these individuals further perpetuate the fraud that helped them reach these positions.

335. Vice Presidents Walid Kakoush and Carla Caldwell both started as admissions counselors for Defendants' online schools and worked their way up to executive positions within EDMC. Masai Turner, AIO's director of training, also started as an admissions representative with AIO. Relators state that Kakoush, Caldwell and Turner actively participated in Defendants' fraudulent schemes and expect those working below them to continue the same types of illegal activity.

336.    Relators aver that senior employees within Defendants' schools are responsible for instituting this massive money making scheme and possess direct knowledge about the lies made to students during the admissions process, the incentive-based compensation scheme, the fact that their online schools receive more than 90% of their revenue from federal financial aid, and the fraudulent student financial information submitted to the federal government.

337.    Defendants' use of the "matrix" and point value system for "confirmed" students bears an uncanny resemblance to the compensation scheme utilized by the University of Phoenix, which was the basis of a prior *qui tam* case against that institution.

338.    This is not surprising as Relators note that the current President of Defendants' Online Division, John Kline, previously held an upper level management position with the University of Phoenix. Moreover, the CEO of EDMC, Todd Nelson, previously worked as the CEO for the Apollo Group, which is the University of Phoenix's parent corporation. OHE VP Walid Kakoush also worked at the University of Phoenix for a period of time.

339.    Relators further state that Defendants are aware of recent *qui tam* cases filed against for-profit higher education entities, including EMDC, alleging that they engaged in illegal recruiting tactics and falsely certified PPAs. In fact, Defendants temporarily changed their philosophy in reaction to these cases, focusing more on identifying students that would succeed in Defendants' online schools and working to retain students once they were enrolled. However, Defendants noted an immediate drop in enrollment numbers and, thus, a drop in federal funds funneled to their schools. In response, Defendants' officers made it clear that this decrease in enrollment was unacceptable and the schools quickly returned to their old fraudulent ways.

340.    What is more, James Ferrance has stated that he was told that Defendants had direct access to an individual within the DOE who informed the schools of impending department actions, which allowed the schools to stay one step ahead of the federal government and conceal their fraudulent activity.

341.    Despite knowledge of this fraud, Defendants have failed to halt the illegal activity and/or inform the United States Government of these issues.  Instead, Defendants have collected hundreds of millions of dollars in fraudulently obtained federal financial aid funds and increased pressure on their recruiters to enroll as many students as possible before the "other shoe drops" and the DOE begins to crack down on the conduct of for-profit schools.

342.    For instance, in late February 2011, Relator Carter attended a videoconference with a number of Defendants' managers and directors.  At this meeting, Walid Kakoush explained that Defendants would be eliminating the matrix and the titles used to identify senior admissions recruiting staff.  Kakoush explained that Defendants' lawyers had informed the companies that their recruiting practices violated federal law and that they needed to exercise greater discretion in how they handled recruitment compensation.  Kakoush further stated that the new polices were implemented over vocal objections by senior managers and supervisors who were worried about a drop in enrollment numbers.  In order to quell this fear, Kakoush assured those in attendance that enrollment numbers were still the "name of the game" and that the changes were made solely to provide the appearance of compliance.  In light of Defendants' access to the DOE, it is not a coincidence that these changes were made a mere two months before the DOJ announced that it would be intervening in a *qui tam* action against EDMC stemming from the company's incentive based compensation scheme.  See  United States, et al. v. Education Management Corporation, et al., 07-cv-00461 (W.D.Pa. 2007).

**First Cause of Action:**

**Knowingly False Statements to Get a False or Fraudulent Claim Paid or Approved, in Violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(A)**

343.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though set forth more fully at length herein.

344.    In performing all of the acts set out herein, Defendants defrauded the United States of America by knowingly presenting, or causing to be presented, to one or more officers, employees or agents of the United States of America, a false and fraudulent claim for payment or approval, in contravention of the False Claims Act (31 U.S.C. § 3729(a)(1)(A)), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay.

345.    Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America is in excess of a half billion dollars per annum, from at least December 1, 2008, through the present.

**Second Cause of Action:**

**Knowingly False Records or Statements to Get a False or Fraudulent Claim Paid or Approved, in Violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(B)**

346.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though set forth more fully at length herein.

347.    By virtue of the acts describe above, Defendants have knowingly made, used or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States of America, in contravention of the False Claims Act (31 U.S.C. § 3729(a)(1)(B)), to the damage of the treasury of the United States of America, by causing it to pay out money it was not obligated to pay.

348.    Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America is in excess of a half billion dollars per annum, from at least December 1, 2008, through the present.

### Third Cause of Action:

### Conspiracy to Submit False Claims, in Violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(C)

349.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though set forth more fully at length herein.

350.    Defendants combined, conspired, and agreed together to defraud the United States by knowingly submitting false claims to the United States and to its grantees for the purpose of getting the false or fraudulent claims paid or allowed and committed the other overt acts as set forth above in furtherance of that conspiracy, in contravention of the False Claims Act (31 U.S.C. § 3729(a)(1)(C)), to the damage of the treasury of the United States of America, by causing it to pay out money it was not obligated to pay.

351.    Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America is in excess of a half billion dollars per annum, from at least December 1, 2008, through the present.

### Prayer for Relief

WHEREFORE, Plaintiffs request the following relief:

352.    Judgment in favor of the United States of America against Defendants, jointly and severally, by reason of the violations of the False Claims Act as set forth above, in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00), and not more than Eleven Thousand Dollars ($11,000), for each violation.

353.   Award to Relators, as the *Qui Tam* plaintiffs, of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act on the United States' recovery.

354.   Award to Relators of all reasonable expenses which the Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs.

355.   Punitive damages on all causes of action, the extent allowable by law.

356.   Such other and further relief as the Court deems proper.

## Demand for Jury Trial

Plaintiffs demand a trial by jury, pursuant to FRCP 38.

DATED: October 22, 2013

ALAN H. PERER

ATTORNEYS FOR *QUI TAM*
PLAINTIFFS MIKE LAUKAITIS,
GREGORY CARTER, OKSANA
HISER, GARLAND RICHIE, SEAN
A. LARDO, JACK BORING, and
CHANEL DENNIS

By: _____
Alan H. Perer
Pa. Id. # 23603

SWENSEN PERER & KONTOS
Firm #262
One Oxford Centre, Suite 2501
Pittsburgh, PA  15222

(412) 281-1970
pererah@aol.com

s/James B. Lieber
James B. Lieber
Pa. Id. #21748
LIEBER HAMMER HUBER &
BENNINGTON, P.C.
5528 Walnut Street
Pittsburgh, PA 15232
(412) 687-2231
jlieber@lhhb-law.com